# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is entered into as of December 2, 2009, by and between THAYER POWER & COMMUNICATION LINE CONSTRUCTION CO., INC. (the "Seller") and THAYER INVESTMENTS LLC (the "Purchaser"). Seller and Purchaser may be referred to herein individually as a "Party" or collectively as the "Parties."

WHEREAS, on October 4, 2008 (the "Petition Date"), Seller filed a voluntary Chapter 11 petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Western District of Pennsylvania, Erie Division, at Case No. 08-11904 (TPA) (the "Bankruptcy Court");

WHEREAS, Seller wishes to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 363 and 365 and other applicable provisions of the Bankruptcy Code, all of the Assets (as defined below), together with the Assumed Liabilities (as defined below), of Seller upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, Purchaser wishes to purchase and take delivery of such Assets and Assumed Liabilities upon such terms and subject to such conditions; and

WHEREAS, Purchaser requires that the Assets be sold pursuant to a Sale Order (as defined below) of the Bankruptcy Court approving the sale under Section 363 of the Bankruptcy Code and authorizing the assumption and assignment of certain executory contracts, unexpired leases and related liabilities, if any, pursuant to Section 365 of the Bankruptcy Code and the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual promises herein, and in consideration of the representations, warranties, and covenants herein, the Parties agree as follows:

## ARTICLE I
## PURCHASE OF ASSETS

1.1     Assets to be Sold.  Upon the terms and subject to the conditions set forth in this Agreement, Seller shall sell, convey, assign, transfer and deliver to Purchaser, free and clear of all encumbrances and Purchaser shall purchase and acquire from Seller, Seller's right, title and interest in and to all Seller's property and assets, tangible and intangible, including the following (but excluding the Excluded Assets (as defined below)):

(a)     all tangible personal property of Seller, including without limitation, all furniture and equipment;

(b)   all inventory of Seller, which Purchaser intends to liquidate after the Closing (defined below), provided, that if the inventory is liquidated for more than One Hundred Thousand Dollars ($100,000.00), the Purchaser will remit all of the excess proceeds (i.e., net proceeds in excess of $100,000.00) (the "Inventory Proceeds") to the Seller within five (5) business days of Purchaser's receipt of such Inventory Proceeds;

(c)   all accounts receivable (the "Accounts Receivable") excluding any accounts receivable aged ninety (90) days or more as of the Closing Date (defined below) (the "Excluded Receivables") ;

(d)   all rights of Seller in any prepaid expenses, including all deposits paid to Seller's suppliers and utility providers, and claims for refunds and rights to offset in respect thereof;

(e)   any executory contracts or unexpired leases (the "Seller Contracts") listed on Schedule 1.1(e) hereto as approved pursuant to Sections 365 and 1113 of the Bankruptcy Code (the "Assumed Contracts");

(f)   all governmental authorizations and all pending applications therefore or renewals thereof, in each case to the extent, if any, they are transferable to Purchaser;

(g)   all data and records related to the operations of Seller, including client and customer lists and records, referral sources, research and development reports and records, production reports and records, service and warranty records, equipment logs, operating guides and manuals, financial and accounting records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and records, provided however, that for the greater of (I) three years after the Closing Date (defined below) or (II) two years after the Bankruptcy Court enters an order closing Seller's Bankruptcy Case. Purchaser shall grant Seller or the Thayer Brothers (as defined below) access to any information described in this paragraph that Seller or the Thayer Brothers deem reasonably necessary in connection with, *inter alia*, Seller's bankruptcy proceeding, Seller's or Thayer Brothers' tax related issues or to pursue Seller's claims, causes of action, choices of action and rights of recovery and Seller or Thayer Brothers shall reimburse Purchaser for any reasonable out-of-pocket expenses incurred by Purchaser in providing such access;

(h)   all of the intangible rights and property of Seller, good-will, telephone and telecopy numbers, and email addresses and websites, to the extent any of the foregoing are transferable;

(i)   all intellectual property rights of Seller including, without limitation, all rights in and to the trademarks, service marks, trade names, trade dress, domain names and other names and brand identifiers held or used by Seller and the applications, registrations and all filings associated therewith;

(j)   all of Seller's rights under any insurance policies under which Seller is a beneficiary;

(k)   all of Seller's rights under any non-disclosure, confidentiality, non-compete or non-solicitation agreement with employees, contractors or agents of Seller, or with third parties, that relate to Seller's business or the Assets;

(l)   all of Seller owned vehicles listed in Schedule 1.1(l); and

1.1(m)    (m)    all of the James Thayer owned vehicles (the "Thayer Vehicles") listed on Schedule

(collectively, all of the items in (a)-(m), the "Assets").

1.2    _Excluded Assets._  Notwithstanding anything to the contrary contained in Section 1.1 or elsewhere in this Agreement, the following assets of Seller (collectively, the "Excluded Assets") are not part of the sale and purchase contemplated hereunder, are excluded from the Assets, and shall remain the property of Seller after the closing:

(a)    all Seller Contracts that are not Assumed Contracts or Purchased Equipment Leases (defined below);

(b)    all claims for refund of taxes and other governmental charges of whatever nature (including any interest related thereto);

(c)    all rights of Seller under this Agreement;

(d)    Seller's corporate seals, stock record books, corporate record books containing minutes of meetings of directors and stockholders; tax returns and records, books of account and ledgers of such other records having to do solely with Seller's organization or stock capitalization or Excluded Assets or Excluded Liabilities (as defined below);

(e)    all personnel records and other records;

(f)    claims against third parties including, but not limited to, Seller's claims, causes of action, choices of action and rights of recovery pursuant to Sections 544 through 550 and Section 553 of the Bankruptcy Code and any other avoidance actions under any other applicable provisions of the Bankruptcy Code;

(g)    cash on hand; and

(h)    the Excluded Receivables.

1.3    _Consideration._  The Purchaser will purchase the Assets (including the Assumed Contracts) for the following total consideration: (a) Two Million One Hundred Thousand Dollars ($2,100,000.00) cash, based upon the Debtor's balance sheet as of September 30, 2009 (the "Cash Purchase Price"); (b) subject to Article VII, the cure costs for the union contracts included in Assumed Contracts set forth on Schedule 1.1(e) (the "Assumed Cure Amounts"); (c) up to Three Hundred Fifty Thousand Dollars ($350,000.00) cash for post-petition administrative expenses of the Seller's bankruptcy estate, the exact amount of which is to be determined at the time of Closing (the "Administrative Expense Fund"); (d) any Inventory Proceeds; and (e) the Purchased Equipment Leases (defined below) (collectively, the Cash Purchase Price, the Assumed Cure Amounts, Administrative Expense Fund, Inventory Proceeds and the Purchased Equipment Leases, the "Purchase Price"). The Purchaser shall pay the Cash Purchase Price and the Administrative Expense Fund at Closing. For purposes of this Agreement, the total Purchase Price is estimated to be Four Million Two Hundred Seventy-Seven Thousand Six Hundred Ninety-Two Dollars ($4,277,692.00).

- 3 -

1.3.1 <u>Adjustment.</u> The Cash Purchase Price is based upon Seller's balance sheet as of September 30, 2009, a true and correct copy which is attached hereto as Schedule 1.3(a) (the "September 30 Statement"). Subject to Article XI, the Cash Purchase Price will be adjusted upwards or downwards, dollar-for-dollar, as of the Closing Date to reflect any changes in Seller's Current Assets (the "Current Assets Adjustment") from the September 30 Statement against the Current Assets on the Closing Date (the "Closing Statement"). The term "Current Assets" shall mean all of Seller's Accounts Receivable excluding the Excluded Receivables. In addition, the Cash Purchase Price shall be adjusted downwards if any of the property, plant, vehicles or equipment (collectively, the Equipment") listed on the September 30 Statement is sold or otherwise disposed of before the Closing (the, "Additional Adjustment", together with the Current Assets Adjustment, the "Closing Adjustments").

1.3.2 <u>Allocation.</u> On the Closing Date, the parties will agree to a Certificate of Allocation setting forth the allocation of the Purchase Price among the Assets which will be binding and conclusive on the parties for all purposes including for reporting to any taxing authority.

1.4 <u>Purchased Equipment Leases.</u> To benefit the Seller's bankruptcy estate, Purchaser will purchase the equipment leased by Seller pursuant to the leases as described on Schedule 1.4 hereto by way of a negotiated buy out of each of such lease upon terms satisfactory to Purchaser (collectively, the "Purchased Equipment Leases").

1.5 <u>Assumed Liabilities.</u> Incident to the purchase of the Assets and as part of the Purchase Price, Purchaser shall assume and become responsible for and shall thereafter pay, perform and discharge in accordance with their terms, any liability arising on and after the Closing Date under the Assumed Contracts, and the Assumed Cure Amounts (collectively, the "Assumed Liabilities").

1.6 <u>Retained Liabilities.</u> Seller shall remain solely responsible for all liabilities that are not Assumed Liabilities (the "Retained Liabilities").

1.7 <u>Deposit.</u> An earnest money deposit (the "Deposit") in the amount of Two Hundred Thousand Dollars ($200,000.00) has been paid by Purchaser into Seller's counsel's non-interest bearing IOLTA trust account. The Deposit will be credited against the Purchase Price at Closing, and disbursed at such time as the post-closing adjustment of Current Assets is made. Subject to Section 9.2, the Deposit shall be refunded to Purchaser in the event the transaction does not close, whether as a result of failure to satisfy the conditions to Closing set forth in Article VII, Purchaser not being the Successful Bidder (as defined in the Bid Procedures Order) at the Bankruptcy Sale, or any other reason other than a breach of this Agreement by Purchaser.

1.8 <u>Closing.</u> The Closing of the sale contemplated by this Agreement (the "Closing" or "Closing Date") shall take place at the offices of the Quinn Law Firm, in Erie, Pennsylvania, and shall occur consistent with timetables established by the Bankruptcy Court which are reasonably satisfactory to Seller and Purchaser, but in any event not later than sixty (60) days after the filing of the Sale Motion (as defined below).

1.9 <u>Collection of Accounts Receivable</u>. On behalf of Seller, Purchaser will use its best efforts to collect the Excluded Receivables for a period of sixty (60) days after Closing and will deposit such collections at the direction of Seller and/or the Bankruptcy Court. Seller shall cooperate with Purchaser in collecting the Excluded Receivables.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER

2.1    Seller represents, warrants and covenants to Purchaser as follows:

(a)    Seller owns the Assets and, if Purchaser is the Successful Bidder at the Bankruptcy Sale, will transfer all of the Assets to Purchaser at the Closing, free and clear of all liens, claims encumbrances, and/or other obligations, consistent with the provisions of the Bankruptcy Code;

(b)    Subject to Bankruptcy Court approval, Seller has the corporate power, legal capacity and authority to enter into and perform under this Agreement, and all other agreements to which Seller is or will be a party that are required in order to consummate the transaction contemplated by this Agreement. The execution, delivery and performance of this Agreement has been duly and validly approved and authorized by all necessary corporate action on the part of Seller;

(c)    Seller will file the Sale Motion seeking entry of a Sale Order approving the sale and this Agreement and finding that Purchaser has purchased the Assets for reasonably equivalent value, and in good faith pursuant to the terms of Section 363(m) of the Bankruptcy Code;

(d)    Except as contained in Section 1.5 herein and Schedule 1.1(e), there are no obligations and/or liabilities of Seller contingent or otherwise being assumed by Purchaser, including without limitation, obligations relating to employees, union contracts, and pension liabilities other than the Assumed Liabilities;

(e)    Except as otherwise disclosed, Seller knows of no fact or event which does, or with the passage of time may, have a materially adverse effect on Seller's business or its prospects;

(f)    Unless otherwise disclosed, Seller has not been cited for any OSHA, EPA and/or any other governmental violation and to the best of Seller's knowledge, there is no fact or event which, with the passage of time, will give cause to a violation of any of the above;

(g)    Except as otherwise disclosed, Seller has not been cited for any unfair labor act nor to the best of Seller's knowledge is there any fact or circumstance which exists that would give rise to an unfair labor act;

(h)    There are no actions, suits, proceedings or investigations pending or to the best of Seller's knowledge threatened against Seller which may have a material adverse impact on Seller, the Assets, or Seller's business prospects;

(i)    The unaudited financial statements of Seller for the period ending December 31, 2008 and September 30, 2009 fairly reflect the financial condition of Seller's business and the results of operations through those dates;

(j)    The Assets to be acquired by Purchaser will include all assets and properties owned by Seller as set forth herein, and collectively with the equipment subject to the Purchased Equipment Leases and the monthly equipment leases with Utility Equipment Leasing Company and MIRK, Inc. represent all of the equipment necessary for the operation and conduct of Seller's business in a manner

consistent with the past practices, including, the existing real estate leases with respect to Seller's business locations, which leases shall be assumed by Seller and assigned to Purchaser if listed as Assumed Contracts on Schedule 1.1(e) hereto;

     (k)    The Accounts Receivable will be real and valid and will have been created in the Company's normal course of business. Bad debt reserves will be computed consistent with past practices;

     (l)    Inventory reserves will be computed consistent with past practices;

     (m)    Property, plant and equipment will be on hand in the quantities listed on Schedule 2.1(m) hereto;

     (n)    Except as otherwise disclosed, Seller has not lost any material suppliers or material customers; and,

     (o)    All of the representations and warranties shall be true at Closing.

    2.2    These representations and warranties will survive only until the Closing after which they are void.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

    3.1    Purchaser represents, warrants and covenants to Seller as follows::

     (a)    Purchaser is duly organized, validly existing and in good standing under the laws of its state of incorporation and is authorized to carry out the transaction contemplated by this Agreement;

     (b)    Purchaser has the ability and intention to consummate the transaction contemplated by this Agreement;

     (c)    Purchaser has the corporate power, legal capacity and authority to enter into and perform its obligations under this Agreement, and all agreements to which Purchaser is or will be a party that are required to be executed in order to consummate the transaction contemplated by this Agreement. The execution, delivery and performance of this Agreement has been duly and validly approved and authorized by person(s) so authorized by Purchaser. The execution and delivery of this Agreement and the consummation of the transaction contemplated hereby have been duly authorized by all necessary corporate action on the part of Purchaser and no other approval is required in connection with the consummation of the transaction contemplated hereby.

     (d)    Except for entry of the Sale Order and any consent required for the Assumed Contracts, no consent, approval, order or authorization of, or registration, declaration or filing with any governmental authority or other person or entity is required to be obtained or made by Purchaser in connection with the execution and delivery of this Agreement or the consummation of the transaction contemplated hereby.

- 6 -

(e)    This Agreement is, or when executed by Purchaser and the other parties hereto will be, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its terms, except as to the effect, if any, of applicable bankruptcy law.

(f)    Neither the execution and delivery of this Agreement nor the consummation of the transaction provided for herein, will conflict with or result in a termination, breach, impairment or violation of: (i) any provisions of Purchaser's charter documents, as currently in effect; or (ii) any order or legal requirement of a governmental authority applicable to Purchaser or any of its assets or properties.

(g)    Purchaser will acquire the Assets for the purposes of investment and not with a view to offering the same for sale in connection with any distribution thereof.

3.2    All of the representations of Purchaser shall be true at Closing.

## ARTICLE IV
## SELLER COVENANTS

4.1    _Advice of Changes_.  During the period from the date of this Agreement until the earlier to occur of the Closing Date or the termination of this Agreement in accordance with the provisions of Article IX hereof, Seller will promptly advise Purchaser in writing of: (a) the discovery by Seller of any event, condition, fact or circumstance occurring on or prior to the date of this Agreement that would render any representation or warranty by Seller contained in this Agreement untrue or inaccurate in any material respect; (b) any event, condition, fact or circumstance occurring subsequent to the date of this Agreement that would render any representation or warranty by Seller contained in this Agreement, if made on or as of the Closing Date (provided that representations and warranties which are confined to a specific date shall speak as of that date), untrue or inaccurate in any material respect; (c) any breach of any covenant or obligation of Seller pursuant to this Agreement; and (d) any event, condition, fact or circumstance that is reasonably likely to make the timely satisfaction of any of the conditions set forth in Article VII impossible or unlikely.

4.2    _Conduct of Business._  Up to and including the Closing Date, Seller and its management team shall conduct operations of Seller only in the ordinary course of business and will not take any of the following actions, except to the extent authorized by the Bankruptcy Court after notice and a hearing which includes notice to Purchaser:

(a) sell, assign, lease or transfer any of its assets, except in the ordinary course of business;

(b) permit any of its shares of stock to be sold, redeemed or transferred;

(c) permit any of its Assets or shares of stock to become subject to any lien, security interest or other encumbrances of any kind of nature, to which they are not subject as of the date of this Agreement;

(d) issue additional shares of stock or participate in any merger or plan of share exchange;

(e) enter into, modify or terminate any contract, instrument, license or permit relating to its business, customers, or creditors, except in the ordinary course of business;

- 7 -

        (f) hire or terminate any of its employees, except for cause or in the ordinary course of business;

        (g) pay, declare or accrue any bonuses, increases in salaries or compensation for services, except in the ordinary course of business;

        (h) incur any indebtedness except in the ordinary course of general business purposes;

        (i) except in the normal course of business, lend any funds, extend any credit or grant any discounts to any person or entity;

        (j) engage in any transaction with any related or affiliated party, except in the ordinary course of business; or

        (k) make any distributions or pay any dividends with respect to the stock of Seller or make any other distributions to the shareholders of any kind except either for salary in the normal course of business or to pay estimated federal and state income taxes on any earnings of Seller.

    4.3    <u>Litigation.</u>  Seller will notify Purchaser in writing promptly after learning of any proceeding by or before any governmental authority, or other litigation initiated or threatened against Seller relating to the business of Seller or the Assets or for the purpose or with the effect of enjoining or preventing the consummation of the transaction contemplated by this Agreement, or which, if adversely determine, would be reasonably expected to have a material adverse effect on Seller or its business prospects.

    4.4    <u>Satisfaction of Closing Conditions</u>.  Seller will use its commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent which are set forth in Article VII on or before the Closing Date.  Subject to the terms and conditions of this Agreement, Seller will use its commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of third parties and to make all filing with, and give all notices to, third parties that may be necessary or reasonably required on its part in order to effect the transactions contemplated hereby.

    4.5    <u>Regulatory Approvals</u>.  Seller shall execute and file, or join in the execution of filing of, any application or other document required to be filed or as specifically requested by Purchaser.

**ARTICLE V**
**PURCHASER COVENANTS**

    5.1    <u>Advice of Changes.</u>  During the period from the date of this Agreement until the earlier to occur of the Closing Date or the termination of this Agreement in accordance with the provisions of Article IX hereof, Purchaser will promptly advise Seller in writing of: (a) the discovery by Purchaser of any event, condition, fact or circumstance occurring on or prior to the date of this Agreement that would render any representation or warranty by Purchaser contained in this Agreement untrue or inaccurate in any material respect; (b) any event, condition or fact or circumstance occurring subsequent to the date of

this Agreement that would render any representation or warranty by Purchaser contained in this Agreement, if made on or as of the Closing Date (provided that the representations and warranties which are confined to a specific date shall speak only as of such date), untrue or inaccurate in any material respect; (c) any breach of any convent or obligation of Purchaser pursuant to this Agreement; and (d) any event, condition, fact or circumstance that is reasonably likely to make the timely satisfaction of any of the conditions set forth in Article VI impossible or unlikely.

5.2    Regulatory Approvals. Purchaser will execute and file, or join in the execution and filing of, any application or other document that may be necessary in order to obtain any governmental authorization, which may reasonably required, or which Seller may reasonably request, in connection with the consummation of the transactions provided for in this Agreement. Purchaser will use commercially reasonable efforts to obtain all such governmental authorizations.

5.3    Litigation. Purchaser will notify Seller in writing promptly after learning of any proceeding threatened or pending for the purpose or with the probable effect of enjoining or preventing the consummation of the transaction contemplated by this Agreement, or which would be reasonably expected to have a material adverse effect on the transaction contemplated by this Agreement.

5.4    Satisfaction of Conditions Precedent. Purchaser will use commercially reasonable efforts to satisfy or cause to be satisfied all of the conditions precedent which are set forth in Article VII on or before the Closing Date. Upon the terms and subject to the conditions of this Agreement, Purchaser will use commercially reasonable efforts to cause the transaction contemplated by this Agreement to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of third parties and to make all filings with, and give all notices to, third parties that may be necessary or reasonably required on its part in order to effect the transaction provided for herein.

## ARTICLE VI
## CONDITIONS TO OBLIGATIONS OF SELLER

Seller's obligations hereunder are subject to the fulfillment or satisfaction, on and as of the Closing Date, each of the following conditions (any one or more of which may be waived by Seller, but only in writing signed on behalf of Seller by an authorized agent):

6.1    Accuracy of Representations and Warranties. Each of the representations and warranties of Purchaser set forth in Article III of this Agreement shall be true and correct in all material respects on and as of the date hereof and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except that to the extent such representations and warranties shall, to such extent, be true and correct as of the date hereof and on and as of such particular date as if made on and as of such particular date.

6.2    Covenants. Purchaser shall have performed and complied in all material respects with all of its covenants contained in Article V on or before the Closing Date.

6.3    Compliance with Law. There shall be no order by any governmental authority or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

6.4  Absence of Litigation.  No proceeding shall be pending which could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms, of the transaction provided for in this Agreement.

6.5  Sale Order.  The Bankruptcy Court shall have entered the Sale Order (as defined below).

6.6  Other Deliveries.  Purchaser shall have delivered to Seller any other documents necessary to consummate the transaction contemplated by this Agreement.

6.7  Current Asset Amount.  Seller and Purchaser shall have agreed upon the amount of the Current Assets as the September 30 Statement.

## ARTICLE VII
## CONDITIONS TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser hereunder are subject to the fulfillment or satisfaction on, and as of the Closing Date, of each of the following conditions (any one or more of which may be waived by Purchaser, but only in a writing signed on behalf of Purchaser by an authorized agent):

7.1  Accuracy of Representations and Warranties.  Each of the representations and warranties of Seller set forth in Article II of this Agreement shall be true and correct in all material respects on and as of the date hereof and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except that to the extent such representations and warranties shall, to such extent, be true and correct as of the date hereof and on and as of such particular date as if made on and as of such particular date.

7.2  Covenants.  Seller shall have performed and complied in all material respects with all of its covenants contained in Article IV on or before the Closing Date.

7.3  Compliance with Law.  There shall be no order by any governmental authority or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

7.4  Absence of Litigation.  No proceeding shall be pending which could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms, of any of the transactions provided for in this Agreement.

7.5  Employment Agreements.  As a condition to Closing, Purchaser will require that both Mr. Joseph Thayer and Mr. James Thayer (collectively, the "Thayer Brothers") enter into employment contracts with, and acceptable to, Purchaser that, provided Purchaser is the Successful Bidder at the Bankruptcy Sale, will provide for a base salary, bonus and equity compensation plan.  In return, the Thayer Brothers will agree to work for Purchaser in their current capacities for a specified period of time and will also agree to enter into non-competition agreements with Purchaser.  In addition, so that the Thayer Brothers are able to concentrate on the operations of Purchaser and not be overly pre-occupied with their personal affairs, Purchaser requires that the Thayer Brothers be either released from their personal guarantees to Key Bank, N.A., or the Thayer Brothers shall have entered into an agreement with Key Bank, N.A. acceptable to the Thayer Brothers for the satisfaction of their guaranty obligation.

Purchaser will also require an in-depth background checks on the Thayer Brothers satisfactory to Purchaser as part of its due diligence inspection for the sale.

7.6     Bid Procedures Order and Sale Order.  The Bid Procedures Order (in form and substance acceptable to Purchaser) shall have been entered by the Bankruptcy Court.  The Sale Order (in form and substance acceptable to Purchaser) shall have been entered by the Bankruptcy Court.

7.7     Other Deliveries.  Seller shall have delivered to Purchaser the following:

(a)     a customary bill of sale for all of the Assets, duly executed by Seller; and

(b)     The assignment of the real estate leases included in the Seller Contracts; and

(c)     such other documents and other instruments of transfer and conveyance as may reasonably be requested by Purchaser, each in form and substance satisfactory to Purchaser and its legal counsel and executed by Seller.

7.8     Due Diligence.  Purchaser shall have completed a satisfactory due diligence review of Seller at Purchaser's discretion by the later of (a) December 15, 2009, or (b) the entry of an Order for the Bidding Procedures Motion (defined below) by the Bankruptcy Court.

7.9     Financing.  Purchaser will obtain satisfactory financing by December 30, 2009.

7.10    AT&T Contract.  The successful negotiation of a new contract with AT&T, which will award Seller the AT&T business on terms substantially similar to, or better than, Seller's existing contract with AT&T which shall be satisfactory to Purchaser.

7.11    Purchased Equipment Leases.  Purchaser will have entered into an agreement for a buyout of the equipment lease(s) with the lessor for each of the Purchased Equipment Leases.

7.12    Union Contracts.  Purchaser will have entered into a payment arrangement with the unions satisfactory to Purchaser for the Assumed Cure Amounts.

7.13    Thayer Vehicles.  Seller will have caused James Thayer to sell to Purchaser the Thayer Vehicles described on Schedule 1.1(m), which shall be free and clear of any and all liens or encumbrances whatsoever.

7.14    Retitled Vehicles.  The vehicles listed on Schedule 1.1(l) titled to Five Star International, Inc. and to David Thayer, shall be retitled to Seller prior to Closing, and shall be free and clear of any and all liens or encumbrances whatsoever.

**ARTICLE VIII**
**BANKRUPTCY PROCEEDING**

8.1     Sale Motion and Order.  Seller shall file a motion (in form and substance acceptable to Purchaser) simultaneous with the execution of this Agreement (the "Sale Motion"), pursuant to Section 363 of the Bankruptcy Code to obtain Bankruptcy Court approval of the sale and this Agreement (the "Sale Order").  The Sale Order shall be reasonably acceptable to Purchaser.  Purchaser understands that

the sale is subject to higher bids at the Bankruptcy Court sale confirmation hearing (the "Bankruptcy Sale") in accordance with the pre-approved Bidding Procedures.

8.2   Bidding Procedures Motion and Order.   Seller shall file a bidding procedures motion (in form and substance acceptable to Purchaser) simultaneous with the execution of this Agreement (the "Bidding Procedures Motion") seeking the Bankruptcy Court's approval of a process and procedure for competitive bidding at the Bankruptcy Sale, requiring without limitation that third party bidders pre-qualify in advance of the date of the Bankruptcy Sale hearing and that competing bids be made on the same terms and conditions as the starting bid (except for the increased Purchase Price) (collectively, the "Bidding Procedures").   As a required component of the Bidding Procedures, Seller shall also seek the Bankruptcy Court's approval of Seller's designation of Purchaser as the "stalking-horse bidder" at the Bankruptcy Sale, and approval of Seller's reimbursement of Purchaser's fees, expenses and costs in accordance with applicable law, as follows:

(a)   Break-Up Fee.   In the event that (i) all of the conditions to Purchaser's obligation to close have been satisfied or waived by Purchaser, (ii) this Agreement has not been terminated prior to the Bankruptcy Sale hearing, (iii) a competitive bid is submitted by a qualified third party bidder in accordance with the court-approved Bidding Procedures, and (iv) such third party bidder submits the highest bid at the sale hearing, is approved by the Bankruptcy Court as the Successful Bidder to purchase the Assets and the sale closes, Purchaser shall be entitled to payment at Closing of a break-up fee in an amount of $150,000 to reimburse Purchaser's expenditure of fees, expenses and costs in connection with the proposed sale and in serving as the stalking-horse bidder (collectively, the "Break-Up Fee").   Seller will cause Lenders (as defined in the Sale Motion) to consent to the Break-Up Fee, and the payment of such fee as set forth herein.   The Break-Up Fee shall be subject to Bankruptcy Court order, after notice and hearing and, shall be entitled to priority as an administrative expense and paid at the time of Closing out of deposit monies made by the Successful Bidder whose bid is ultimately determined to be the highest and best offer by the Bankruptcy Court;

(b)   Initial Upset Bid.   The initial upset bid by a qualified third party bidder must, in addition to any other requirements, equal the Purchase Price plus $175,000;

(c)   Further Bid Increments.   Bids submitted after the initial upset bid must exceed the Purchase Price in increments by at least $100,000; and,

(d)   Confidentiality Agreements.   Seller agrees that potential bidders for the Assets shall be required to execute a Confidentiality Agreement substantially in the form attached hereto as Schedule 8.2(d).

## ARTICLE IX
## TERMINATION

9.1   Termination of Agreement.   The Parties may terminate this Agreement as provided below:

(a)   Purchaser and Seller may terminate this Agreement by mutual written consent at any time prior to Closing;

(b)     Purchaser may terminate this Agreement at its option by giving written notice to Seller at any time prior to the Closing if:

(i)     Seller has breached any representation, warranty, or covenant contained in Articles II and/or IV of this Agreement in any material respect, Purchaser has notified Seller of the breach, and the breach has continued without cure reasonably satisfactory to Purchaser for a period of ten (10) days after the notice of the breach, or Seller fails to consummate the transactions contemplated by this Agreement, notwithstanding the satisfaction or waiver of all of the conditions set forth in Section VI hereof; or

(ii)     Purchaser's conditions to Closing set forth in Article VII are not satisfactorily met in Purchaser's sole discretion; or

(iii)     The Closing shall not have occurred on or before February 15, 2010, unless the Parties agree otherwise (unless the failure results primarily from Purchaser itself breaching any representation, warranty, or covenant contained in this Agreement).

(c)     Seller may terminate this Agreement by giving written notice to Purchaser at any time prior to Closing if:

(i)     Purchaser has breached any representation, warranty, or covenant contained in Articles III and/or V of this Agreement in any material respect, Seller has notified Purchaser of the breach, and the breach has continued without cure reasonably satisfactory to Seller for a period of ten (10) days after the notice of the breach, or Purchaser fails to consummate the transaction contemplated by this Agreement, notwithstanding the satisfaction or waiver of all of the conditions set forth in section VII hereof; or

(ii)     The Closing shall not have occurred on or before February 15, 2010, unless the Parties agree otherwise (unless the failure results primarily from Seller breaching any representation, warranty, or covenant contained in this Agreement).

9.2     Deposit.     In the event of termination of this Agreement by Purchaser under Section 9.1 above, the Deposit will be returned to Purchaser by Seller within five (5) business days of the receipt of written notice in the case of Section 9.1(b) or (c), or the date that the mutual agreement is reached by the parties in the case of Section 9.1(a). In the event that Purchaser is not the successful bidder as set forth in Section 8.2 above, the refund of the Deposit will be directed by the Bankruptcy Court.

## ARTICLE X
## TAXES

10.1    Tax Refunds. Any tax refunds (including any interest related thereto) received by Purchaser with respect to the Assets or Seller's business relating to taxes paid for the pre-Closing tax period that Seller has paid shall be for the account of Seller, and Purchaser shall pay over any such amount within five (5) business days of receipt thereof. Purchaser shall include with its remittance to Seller copies of any correspondence, documents or other materials received or transmitted to Purchaser with respect to any tax refund.

10.2    Cooperation on Tax Matters. Seller and Purchaser shall cooperate fully with each other and make available or cause to be made available to each other for consultation, inspection and copying (at such other Party's expense) in a timely fashion such personnel, tax data, relevant tax returns or portions thereof and filings, files, books, records, documents, financial, technical and operating data, computer records and other information as may be reasonably required (i) for the preparation by such other Party of any tax returns or (ii) in connection with any tax audit or proceeding including one Party to the extent such tax audit or proceeding relates to or arises from the transactions contemplated by this Agreement or Seller's business activities prior to the Closing Date.

## ARTICLE XI
## POST CLOSING ADJUSTMENTS

11.1    Post Closing Adjustments. Within ten (10) days after the Closing, Seller and Purchaser shall meet to determine and agree upon the amount of the Current Assets on the Closing Statement and the disposition (if any) of any Equipment of Seller since the September 30 Statement. Based on the difference of the Currents Assets as of the September 30 Statement and the Closing Statement and any disposition of the Equipment, the parties will determine the amount of the Closing Adjustments (if any) as set forth in Section 1.3. In the event that Seller and Purchaser cannot agree on the amount of the Current Assets at Closing, the disposition of the Equipment or the amount of any Closing Adjustments, then the Bankruptcy Court shall have exclusive jurisdiction to adjudicate such dispute(s).

## ARTICLE XII
## MISCELLANEOUS

12.1    Entire Agreement. This Agreement, the Schedules and Exhibits hereto constitute the entire understanding and agreement of the Parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance or usage of trade inconsistent with any of the terms hereof.

12.2    <u>Assignment; Binding Upon Successors and Assigns.</u>  Neither Party hereto may assign any of its rights or obligations hereunder without the prior written consent of the other Party hereto.  This Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

12.3    <u>No Third Party Beneficiaries.</u>  No provisions of this Agreement are intended, nor will be interpreted, to provide or create any third party beneficiary rights or any other rights of any kind in any client, customer, affiliate, stockholder, partner, employee of any Party hereto or any other person or entity unless specifically provided otherwise herein, and, except as so provided, all provisions hereof will be personal solely between the Parties to this Agreement.

12.4    <u>Severability.</u>  If any provision of this Agreement, or the application thereof, is for any reason held to any extent to be invalid or unenforceable, the remainder of this Agreement and application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the Parties hereto.  The Parties further agree to replace such unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of the void or unenforceable provision.

12.5    <u>Section Headings.</u>  A reference to an Article, Section, Schedule or Exhibit will mean an Article or Section in, or a Schedule or Exhibit to, this Agreement, unless otherwise explicitly set forth.  The titles and headings in this Agreement are for reference purposes only and will not in any manner limit the construction of this Agreement.  For the purposes of such construction, this Agreement will be considered as a whole.

12.6    <u>Amendment, Extension and Waivers.</u>  At any time prior to the Closing Date, Purchaser and Seller may, to the extent legally allowed:  (a) extend the time for performance of any of the obligations of the other Party;  (b) waive any inaccuracies in the representations and warranties made to such Party contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements, covenants or conditions for the benefit of such Party contained herein.  Any term or provision of this Agreement may be amended at any time.  Any agreement to any amendment, extension or waiver will be valid only if set forth in writing and signed by all Parties.  The waiver by a Party of any breach hereof or default in the performance hereof will not be deemed to constitute a waiver of any other default or any succeeding breach or default.  The failure of any party to enforce any of the provisions hereof will not be construed to be a waiver of the right of such party thereafter to enforce such provisions.

12.7    <u>Confidentiality.</u>  Purchaser acknowledges that it has and will receive certain confidential information with respect to the operations of Seller.  Purchaser, along with its agents and representatives, shall act in accordance with the Confidentiality Agreement signed between Anderson Group LLC and MelCap Partners LLC on April 15, 2009.

12.8    <u>Governing Law.</u>  The validity of the Agreement, the construction of its terms, and the interpretation and enforcement of the rights and duties of the Parties to this Agreement will be exclusively governed by and construed in accordance with the internal laws of the Commonwealth of Pennsylvania without reference to that body of law relating to conflicts of law or choice of law.

12.9    Jurisdiction; Venue; Waiver of Jury Trial.

(a)    Each Party to this Agreement hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes between the Parties pertaining directly or indirectly to this Agreement or to any matter arising herefrom.  To the extent permitted by law, each Party hereby expressly submits and consents in advance to such jurisdiction in any action or proceeding commenced by the other Party, and agrees that service of such summons and complaint or other process or papers may be made by registered or certified mail addressed to such Party at the address to which notices are to be sent pursuant to this Agreement. Each of the Parties waives any claim that the Bankruptcy Court is an inconvenient forum or an improper forum based on lack of venue.  The choice of forum set forth in this Section shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action to enforce the same in any other appropriate jurisdiction.

(b)    Each Party hereto waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury with respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement.  Each Party hereto (i) certifies that no representative, agent or attorney of the other Party has represented, expressly or otherwise, that the other Party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other Party hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section.

12.10   Notices.  Any notice or other communication required or permitted to be given under this Agreement will be in writing or electronic written format, will be delivered personally or by mail or express delivery, postage prepaid, or by electronic mail or by facsimile transmission, and will be deemed given upon actual delivery, or upon transmission if sent via electronic mail or facsimile transmission, or, if mailed by registered or certified mail, on the third business day following deposit in the mail, addressed as follows:

If to Purchaser, to:

Thayer Investments LLC
Cory Gaffney
121 W. Long Lake Road, Third Floor
Bloomfield Hills, Michigan 48304
Fax:  (248) 645-8001
Email:  cory@andersongroup.biz

with a copy to:

Harry W. Greenfield, Esq.
Rosemary Sweeney, Esq.
1400 Fifth Third Center
Cleveland, Ohio 44114
Fax: (216) 579-1040
Email: Greenfield@buckleyking.com
          Sweeney@buckleyking.com

If to Seller, to:

    Joseph A. Thayer
    President & CEO
    Thayer Power and Communication Line Construction Co., Inc.
    7400 Market Road
    P.O. Box 915
    Fairview, Pennsylvania 16415
    Fax: (814) 835-3884
    Email: josephthayer@thayerpc.com

    with a copy to:

    Lawrence C. Bolla, Esq.
    Quinn Law Firm
    2222 West Grandview Boulevard
    Erie, Pennsylvania 16506
    Fax: (814) 835-2076
    Email: lbolla@quinnfirm.com

12.11   Time is of the Essence.   The Parties hereto acknowledge and agree that time is of the essence in connection with the execution, delivery and performance of this Agreement.

12.12   Due Diligence Inspection.   Seller shall permit Purchaser and its agents, legal counsel, accountants, and other representatives to: (a) have reasonable access during normal business hours to all properties, inventory and equipment of Seller; (b) inspect and make copies of any and all documents and records of Seller including without limitation all journals, ledgers, stock records, personnel records, contracts, leases, licenses and all other records, regardless of kind or character, as Purchaser shall from time to time reasonably request; (c) review the books and records of Seller; and (d) conduct such other due diligence as Purchaser or its counsel may reasonably deem advisable. Purchaser acknowledges that any such inspection is subject to the Confidentiality Agreement signed between Anderson Group LLC and MelCap Partners LLC on April 15, 2009.

12.13   Counterparts.   This Agreement may be executed in counterparts, each of which will be an original as regards any Party whose name appears thereon and all of which together will constitute one and the same instrument, and may be delivered electronically. This Agreement will become binding when one or more counterparts hereof, individually or taken together, bear the signatures of all Parties reflected hereon as signatories.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement as of the date first set forth above.

**SELLER**
THAYER POWER & COMMUNICATION LINE
CONSTRUCTION CO., INC.

By: _____
    Name: *S.K. Thayer*
    Title: *President*

**PURCHASER**
THAYER INVESTMENTS LLC

By: _____
    Name:
    Title:

8327\002\Anderson Group - Asset Purchase Agreement 008

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement as of the date first set forth above.

**SELLER**
THAYER POWER & COMMUNICATION LINE
CONSTRUCTION CO., INC.

By:_____
     Name:
     Title:


**PURCHASER**
THAYER INVESTMENTS LLC

By:_____
     Name:
     Title:

**Schedule 1.1(c)**
**Assumed Contracts**

| Assumed Contract | Cure Amount |
|---|---|
| Pitney Bowes (Lease/Account No. 2103-7124-86-0) lease of postage equipment. | $0.00 |
| Pitney Bowes Global Financial (Lease/Account No. 3874865) lease of postage equipment | $0.00 |
| The Jamie Joe Group – lease of 7400 Market Road, Fairview, Pa 16415 and lease of 973 New Castle Road, Butler, PA 16001 | $12,000, to be paid by Seller prior to Closing |
| Gross Lease Agreement, dated October 2, 2006, as amended by First Amendment to Lease Agreement, dated September 23, 2009, between YDT Sinclair Road LLC and Seller, for 3,200 square feet of floor area at 5158 Sinclair Road, Columbus, OH, | $1,675, to be paid by Seller prior to Closing |
| Lease (no title), dated November 2, 2005, between Michael Downing Realty and Seller, regarding 4328 Cranwood Parkway, Warrensville Heights, OH 44128 | $2,815.56, to be paid by Seller prior to Closing |
| Lease, dated June 28, 2007, between ProCleve Instruments, LLC and Seller regarding 800 Killian Road, Akron, OH 44319 | $4,583.33, to be paid by Seller prior to Closing |
| Lease Agreement, date April 1, 2009 between Weber Holdings-Westpick LLC and Seller regarding 117 Cypress Street, Reynoldsburg, OH 43068 | $2,193.75, to be paid by Seller prior to Closing |
| IBEW – National TeleData Agreement | $0.00 |
| TeleData Agreement, dated December 2004, concerning IBEW Local No. 126 and NECA (Northeastern Line Constructors Chapter) | $1,044.74 |

| | |
|---|---|
| Commercial Agreement, dated September 1, 2006, concerning IBEW Local No. 1319 and NECA (Northeastern Line Constructors Chapter) | $44,971.83 |
| National TeleData Agreement, dated September, 1999, concerning IBEW Local No. 369 (Kentucky) and NECA (American Line Builders Chapter). | $692.08 |
| Agreement, dated April 25, 2006, concerning IBEW Local No. 56 and NECA (Western Pennsylvania Chapter) | $4,054.96 |
| National TeleData Agreement, dated September, 1999, concerning IBEW Local No. 71 and NECA (American Line Builders Chapter). | $8,155.17 |
| Teledata Agreement, dated December 14, 2004, concerning IBEW Local No. 1249 and NECA (Northeastern Line Constructors Chapter) | $1,141.82 |
| Agreement between NECA and IBEW Local Nos. 71 & 245 (Agreement No. 4-71/245-A), dated December 23, 2008 | $0.00 |
| Inside Construction Agreement, dated August 19, 2005, between IBEW Local No. 5 and NECA (Western Pennsylvania Chapter) | $116,564.28 |
| CWA Local No. 4340 – (AFL-CIO Agreement) | $4,095.56 |
| National Electric Benefit Fund –fringe benefits (This Agreement is contained within the respective Union Contracts.) | $343,135.84 Pre-Petition |
| National Electric Annuity Plan – fringe benefits (This Agreement is contained within the respective Union Contracts.) | $421,314.91 Pre-Petition |
| Western Pennsylvania Electrical Employees Benefit – Local Nos. 5 & 56 – (This Agreement is contained within the respective Union Contracts.) | $0.00 |

**Schedule 1.3(a)**
**September 30, 2009 Balance Sheet**

# Thayer Power and Communication Line Construction Co., Inc.
## Balance Sheet
### September 30, 2009

| | Book value at end of current reporting month | Book value on petition date |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Unrestricted cash and equivalents | $ 119,391.17 | $ (48,362.50) |
| Cash on hand | 27,410.15 | 2,537.82 |
| Payroll tax escrow | - | - |
| Accounts receivable, net | 2,372,382.20 | 3,804,766.26 |
| Expense advance to insider | 1,346.03 | - |
| Inventories, net of reserves | 100,000.00 | 609,929.64 |
| Costs in excess of billings on uncompleted contracts | 762,126.54 | 736,995.00 |
| Costs and estimated earnings in excess of billings | 120,682.63 | 120,682.63 |
| Deposits to vendors | 86,984.54 | - |
| Prepaid expenses | 126,290.17 | - |
| Professional retainers | 40,000.00 | 25,000.00 |
| Unsecured creditor fund | 100,000.00 | - |
| **TOTAL CURRENT ASSETS** | 3,856,613.43 | 5,251,548.85 |
| | | |
| **PROPERTY AND EQUIPMENT** | | |
| Machinery and equipment | 8,913,668.59 | 8,895,707.01 |
| Leasehold improvements | 243,455.06 | 243,455.06 |
| Less accumulated depreciation | 8,650,310.92 | 7,991,812.93 |
| **TOTAL PROPERTY AND EQUIPMENT** | 506,812.73 | 1,147,349.14 |
| | | |
| **TOTAL ASSETS** | $ 4,363,426.16 | $ 6,398,897.99 |

# Thayer Power and Communication Line Construction Co., Inc.
## Balance Sheet
### September 30, 2009

| | Book value at end of current reporting month | Book value on petition date |
|---|---:|---:|
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **LIABILITIES NOT SUBJECT TO COMPROMISE (Postpetition)** | | |
| Accounts payable - trade | $ 301,062.66 | $ - |
| Bank credit card payable | 3,487.09 | - |
| Taxes payable (refer to Form MOR-4) | - | - |
| Accrued payroll (includes 8,986.46 due to insiders) | 138,021.89 | |
| Accrued insurance | - | |
| Accrued union benefits | 62,864.06 | |
| Accrued rent | - | |
| Accrued interest and bank fees | 80,000.00 | - |
| **TOTAL POSTPETITION LIABILITIES** | 585,435.70 | - |
| | | |
| **LIABILITIES SUBJECT TO COMPROMISE (PREPETITION)** | | |
| Bank overdraft (Key Bank) | 267,424.94 | 420,462.81 |
| Accounts payable - trade | 1,513,331.67 | 1,569,766.20 |
| Bank credit card payable | 198,244.40 | 198,244.40 |
| Billings in excess of costs and estimated earnings | 86,945.06 | 86,945.06 |
| Accrued rent (due to insiders) | 5,000.00 | 5,000.00 |
| Taxes payable | 4,149,198.58 | 4,436,572.71 |
| Accrued interest | 34,518.37 | 117,886.43 |
| Accrued insurance | 295,599.00 | 430,974.58 |
| Accrued payroll | - | 148,082.67 |
| Withheld support | 4,249.83 | 6,745.08 |
| Accrued union benefits | 756,768.72 | 1,069,889.46 |
| Accrued pension | (1,955.58) | 18,943.86 |
| Interest rate swap liability | 162,076.30 | 162,076.30 |
| Loan payable - Jamie/Joe Group (insiders) | 138,795.09 | 138,795.09 |
| Capital lease obligations | 696,627.26 | 935,560.23 |
| Line of credit | 2,366,937.63 | 2,500,000.00 |
| Long-term debt | 6,000,000.00 | 6,000,000.00 |
| **TOTAL LIABILITIES SUBJECT TO COMPROMISE (PREPETITION)** | 16,673,761.27 | 18,245,944.88 |
| | | |
| **STOCKHOLDERS' ACCUMULATED DEFICIT** | | |
| Capital stock | 450.00 | 450.00 |
| Additional paid-in capital | 6,761.00 | 6,761.00 |
| Retained earnings - prepetition | (11,904,978.48) | (11,854,257.89) |
| Retained earnings - postpetition | (998,003.33) | - |
| **TOTAL STOCKHOLDERS' ACCUMULATED DEFICIT** | (12,895,770.81) | (11,847,046.89) |
| | | |
| **TOTAL LIABILITIES AND STOCKHOLDER'S DEFICIT** | $ 4,363,426.16 | $ 6,398,897.99 |

### Schedule 1.1(l)
### Debtor Owned Vehicle List

| Motor Vehicle | Date of Title | Lienholder |
|---|---|---|
| 2000 Ford Truck (VIN 1FTNX20F8YEC86874) | 5/1/2000 | Key Bank N.A. |
| 2000 Butler Trailer (VIN 1BUP25105Y1002222) | 6/22/2000 | Key Bank N.A. |
| 2000 Ford Truck (VIN 1FDAW56F3YEC86870) | 7/3/2000 | Key Bank N.A. |
| 1999 Ford Truck (VIN 1FDXF46F4XEE75451) | 10/26/1999 | Key Bank N.A. |
| 1999 Ford Truck (VIN 1FDXF46F8XEE75453) | 10/26/1999 | Key Bank N.A. |
| 2002 Butler Trailer (VIN 1BUP2510921005258) | 4/23/2002 | Key Bank N.A. |
| 2000 Ford Truck (VIN 1FDXF46F5YED73335) | 3/25/2002 | Key Bank N.A. |
| 2000 Ford Truck (VIN 1FDXF46F7YED73336) | 3/25/2002 | Key Bank N.A. |
| 2001 Cornelius Trailer (VIN 4MJUB20241E029609) | 8/10/2001 | Key Bank N.A. |
| 2001 Rogers Trailer (VIN 1RBH372001AR23634) | 7/16/2001 | Key Bank N.A. |
| 2001 GMC Truck (VIN 1GTHG39R711223505) | 6/27/2001 | Key Bank N.A. |
| 2001 GMC Truck (VIN 1GTHG39R411226541) | 6/27/2001 | Key Bank N.A. |
| 2001 Ford Truck (VIN 1FTNX20F91EC19898) | 6/4/2001 | Key Bank N.A. |
| 2001 Chevrolet Truck (VIN 1GCHG39RX11138271) | 5/31/2001 | Key Bank N.A. |
| 2001 International Truck (VIN 1HTSDAAN61H340708) | 4/17/2001 | Key Bank N.A. |
| 2001 International Truck (VIN 1HTSDAAN41H340707) | 4/17/2001 | Key Bank N.A. |
| 2000 Jeep Cherokee (VIN 1J4FF58S7YL198088) | 4/3/2001 | Key Bank N.A. |
| 2000 GMC Truck (VIN 1GDM7H1C7YJ509637) | 7/11/2000 | Key Bank N.A. |
| 2000 Butler Trailer (VIN 1BUP25107Y1002223) | 6/23/2000 | Key Bank N.A. |
| 2000 Butler Trailer (VIN 1BUC1010571002225) | 6/23/2000 | Key Bank N.A. |
| 2000 Butler Trailer (VIN 1BUC1010103Y1002224) | 6/22/2000 | Key Bank N.A. |
| 2000 International Truck (VIN 1HTSDAAN9YH256675O) | 6/12/2000 | Key Bank N.A. |
| 2000 Belshe Trailer (VIN 16JF02032Y1034422) | 6/6/2000 | Key Bank N.A. |
| 2000 Ford Truck (VIN 1FTSS34F2Y1IB27431) | 5/5/2000 | Key Bank N.A. |
| 2000 Ford Truck (VIN 1FTNX20F4YEC86872) | 5/3/2000 | Key Bank N.A. |
| 2000 Ford Truck (VIN 1FTNX20F6YEC86873) | 5/3/2000 | Key Bank N.A. |
| 2000 Ford Truck (VIN 1FTNX20F2YEC86871) | 5/3/2000 | Key Bank N.A. |
| 2000 GMC Truck (VIN 1GDM7H1C1YJ509410) | 4/17/2000 | Key Bank N.A. |
| 1998 Brooks Brothers Trailer (VIN 1B9PS0819WM274104) | 10/14/1999 | Key Bank N.A. |
| 1998 Belshe Trailer (VIN 16JF01426W1032150) | 6/2/1999 | Key Bank N.A. |
| 1999 International Truck (VIN 1HTSDAAN1XH654064) | 3/12/1999 | Key Bank N.A. |
| 1999 International Truck (VIN 1HTSDAANXXH654063) | 3/12/1999 | Key Bank N.A. |
| 1997 Peterbilt Tractor Trailer (VIN 1XPGDU9X6VN430747) | 10/16/1996 | Key Bank N.A. |
| 1995 EMI Trailer (VIN 1EMRN50R5T031843A) | 4/30/1996 | Key Bank N.A. |
| 2005 Butler Trailer (VIN 1BUC1010051002192) | 7/12/2005 | Key Bank N.A. |
| 2001 Jeep SW (VIN 1J4FF48S51L584296) | 9/17/2001 | Key Bank N.A. |
| 2002 Chevrolet Truck (VIN 1GCHG39R921104291) | 9/20/2001 | Key Bank N.A. |
| 2001 Ford Truck (VIN 1FTNX20F71ED87569) | 8/3/2001 | Key Bank N.A. |
| 2002 Butler Trailer (VIN 1BUC2520X21005444) | 11/7/2002 | Key Bank N.A. |
| 2003 International Truck (VIN 1HTMKAAN73H558156) | 11/22/2002 | Key Bank N.A. |
| 2000 I-Telsta (VIN 1HTSDAANOYH256751) | 5/25/2000 | Key Bank, N.A. |
| 2005 Chevrolet Truck (VIN 1GCHK29UX5E268191) | 5/6/2005 | Key Bank N.A. |
| 2005 Butler Trailer (VIN 1BUC1010151001987) | 4/23/2005 | Key Bank N.A. |

| Vehicle | Date | Lienholder |
|---|---|---|
| 2005 Butler Trailer (VIN 1BUC1010551001989) | 4/23/2005 | Key Bank N.A. |
| 2005 Butler Trailer (VIN 1BUC1010351001988) | 4/23/2005 | Key Bank N.A. |
| 2005 Chevrolet Truck (VIN 1GCHK39235E233626) | 3/16/2005 | Key Bank N.A. |
| 2005 Chevrolet Truck (VIN 1GCHK39245E234400) | 3/10/2005 | Key Bank N.A. |
| 2005 Chevrolet Truck (VIN 1GCHK39275E235394) | 3/10/2005 | Key Bank N.A. |
| 2000 Ford Truck (VIN 3FDNF6527YMA44924) | 3/9/2005 | Key Bank N.A. |
| 2005 Chevrolet Truck (VIN 1GCHG39U951161406) | 2/24/2005 | Key Bank N.A. |
| 2004 Chevrolet Truck (VIN 1GCHK332X4F226321) | 5/28/2004 | Key Bank N.A. |
| 2004 Chevrolet Truck (VIN 1GCHK39244E330154) | 5/28/2004 | Key Bank N.A. |
| 2004 International Truck (VIN 1HTMKAAN74H611214) | 10/9/2003 | Key Bank N.A. |
| 2003 Chevrolet Truck (VIN 1GBJK39163E211775) | 9/2/2003 | Key Bank N.A. |
| 2003 Chevrolet Truck (VIN 1GBJK39103E218785) | 7/8/2003 | Key Bank N.A. |
| 2003 Chevrolet Truck (VIN 1GCHC29193E126432) | 11/7/2002 | Key Bank N.A. |
| 2003 Chevrolet Truck (VIN 1GCHC29193E131033) | 11/7/2002 | Key Bank N.A. |
| 2003 International Truck (VIN 1HTMKAAN53H558155) | 5/23/2002 | Key Bank N.A. |
| 1999 Ford Truck (VIN 1FTSE34L5XHA77281) | 4/24/2002 | Key Bank N.A. |
| 2000 Freightliner Truck (VIN 1FV6HJAA7YHA41407) | 11/9/2004 | Key Bank N.A. |
| 2000 Freightliner Truck (VIN HTMKAAN45H106197) | 10/14/2004 | Key Bank N.A. |
| 2004 Butler Trailer (VIN 1BUP2510241001491) | 8/26/2004 | Key Bank N.A. |
| 2000 Chevrolet Truck (VIN 1GBJC34R7YF493551) | 7/30/2004 | Key Bank N.A. |
| 2004 Chevrolet Truck (VIN 1GBJK39204E326950) | 7/28/2004 | Key Bank N.A. |
| 2001 Cable Trailer (VIN 1BUC1010211004553) | 6/14/2001 | Key Bank, N.A. |
| 2001 Cable Trailer (VIN 1BUC10105Y1002032) | 6/14/2001 | Key Bank, N.A. |
| 2001 Cable Trailer (VIN 1BUC1010411004554) | 6/14/2001 | Key Bank, N.A. |
| 2003 C-3500 Pickup (1GBJK39163E211775) | 9/2/2003 | Key Bank, N.A. |
| **Vehicles Owned Free & Clear** | **Date of Title** | |
| 1990 Butler Trailer (VIN 1BUP25101L1007966) | 8/8/2001 | |
| 1997 Ford Truck (VIN 1FTHX25F3VEC67909) | 12/5/1997 | |
| 1996 Ford Truck (VIN 1FDLF47F0TEA99760) | 9/12/1996 | |
| 1995 Ford Truck (VIN 1FDLF47FXSEA49432) | 10/29/1996 | |
| 2002 Skylift Mini Derrick (VIN 1021) | 10/31/2002 | |
| 1997 Ford Truck (VIN 1FTDX1723VKA09698) | 2/28/1996 | |
| 1992 Butler Trailer (VIN 1BUC1010XM1009276) | 8/8/2001 | |
| 2001 Ford Truck (VIN 1FDXF46F21EA67702) | 6/14/2001 | |
| 2001 Top Brand Trailer (1TBUT0718WV014947) | 4/16/2001 | |
| 1990 Butler Trailer (VIN 1BUP25109L1007965) | 10/25/2000 | |
| 1991 Butler Trailer (VIN 1BUC10106M1009159) | 3/12/1990 | |
| 1997 Ford Truck (VIN 1FDXF80E3VVA00197) | 8/30/2000 | |
| 2000 Rogers Trailer (VIN 1RBT3120XYAR23755) | 7/27/2000 | |
| 2000 Ford Truck (VIN 3FDNF655XYMA42594) | 6/7/2000 | |
| 1997 Ford Truck (VIN 1FTHX25F8VEC67923) | 12/5/1997 | |
| 1997 Ford Truck (VIN 3FELF47F2VMA60810) | 7/2/1998 | |
| 1991 Butler Trailer (VIN 1BUC10103M1008275) | 9/8/1998 | |
| 1998 International (VIN 1HTSDAAN7WH501610) | 8/29/1997 | |
| 2007 Butler Trailer (VIN 1BUC101871003559) | 5/29/2007 | |
| 2007 Butler Trailer (VIN 1BUP2510171003589) | 7/12/2007 | |
| 2007 Butler Trailer (VIN 1BUP2510561003254) | 1/9/2008 | |

| | | |
|---|---|---|
| 2007 (Pole) Semi Trailer (VIN 1BUP2510371003951) | 3/6/2008 | |
| 2007 Butler Trailer (VIN 1BUP2510871003914) | 3/6/2008 | |
| 1980 Highway Trailer (VIN 137553) | Unknown | |
| 1990 International Truck (VIN 1HTSETVN6LH228061) | 11/13/1989 | |
| 1988 Butler Trailer (VIN 1BUC1010711003074) | 4/30/1992 | |
| 1993 Hudson Trailer (VIN 10HHTD1A8P1000024) | 8/30/1993 | |
| 1993 Butler Trailer (VIN 1BUP25105P1001733) | 9/23/1993 | |
| 1993 Butler Trailer (VIN 1BUP25103P1001732) | 9/23/1993 | |
| 1995 Ford Truck (VIN 1FDXF80E0SVA35467) | 7/5/1995 | |
| 1995 Ford Truck (VIN 1FDXF80E9SVA35466) | 7/6/1995 | |
| 2007 Load Trail Trailer (VIN 4ZEXF142X71037778) | 5/25/2007 | |
| 2007 Butler Trailer (VIN 1BUC1010771003505) | 5/24/2007 | |
| 2007 Butler Trailer (VIN 1BUC1010571003504) | 5/24/2007 | |
| 2006 Butler Trailer (VIN 1BUP2510861003295) | 4/30/2007 | |
| 2006 Butler Trailer (VIN 1BUC1010461003296) | 4/30/2007 | |
| 2006 Butler Trailer (VIN 1BUP2510861003006) | 7/17/2006 | |
| 2006 Butler Trailer (VIN 1BUP2510X61003007) | 7/17/2006 | |
| 2006 Fobes Trailer (VIN TA62016PF67KTE260) | 5/23/2006 | |
| 2006 Carry On Trailer (VIN 4YMUL06166V018505) | 5/19/2006 | |
| 2006 Butler Trailer (VIN 1BUP2510961002981) | 5/12/2006 | |
| 2006 Fobes Trailer (VIN TA62016PF57KTE249) | 1/31/2006 | |
| 2004 Cable Reel (VIN 1BUC1010341001097) | 5/11/2004 | |
| 2001 Conrail Trailer (VIN 4KNUC16201L161267) | 6/12/2003 | |
| 2003 Atlas Trailer (VIN 5HCKC16233E001516) | 10/22/2002 | |
| 2002 Corn Trailer (VIN 4MJUB2027E031470) | 5/6/2002 | |
| 2006 Millennium Trailer (VIN 5MTPD25266A000046) | 12/2/2005 | |
| 1994 Butler Trailer (VIN 1BUC10108R1003435) | 2/15/2005 | |
| 2004 Cam Trailer (VIN 5JPBU20284P007968) | 10/19/2004 | |
| 2005 Elk River Trailer (VIN 1E9B120205E353366) | 9/28/2005 | |
| 2004 I-Truck Tractor (VIN 2HSCNASE44C085950) | 5/13/2003 | The owner on this vehicle is incorrectly listed as Five Star International, Inc. on the Certificate of Title. To be retitled to Seller. |
| 2003 Pole Trailer (VIN 4HAAB20033B000006) | 3/29/2005 | |
| 1988 Pole Trailer (VIN 1BUP2510811002401) | Unknown | |
| 1980 Pole Trailer (VIN TJ3781PA) | Unknown | Owner: David O. Thayer. To be retitled to Seller prior to Closing. |
| 2000 Cable Trailer (VIN 1BUC10103Y1002224) | 6/22/2000 | |
| 1994 Cable Trailer (VIN 1BUC10102R1003589) | 2/19/1998 | |
| 1992 Cable Trailer (VIN 1BUC10103N1009704) | 2/19/1998 | |
| 1991 Cable Trailer (VIN 1BUC10104M1009158) | 10/25/2000 | |
| 2000 Cable Trailer (VIN 145515) | Unknown | |
| 2004 Equipment Trailer (VIN 5FTDE272731020059) | 8/28/2004 | |

| | | |
|---|---|---|
| 2004 Equipment Trailer (VIN 10HHBC10441000036) | 7/12/2004 | |
| 2002 Equipment Trailer (VIN 1S9KF202X1L801012) | 11/19/2002 | |
| 1993 Equipment Trailer (VIN 1BUD12109P1001691) | 3/22/2004 | |
| 1998 Cable Trailer (883074) | 4/30/1992 | |

### Schedule 1.1(m)
### James Thayer Owned Vehicle List

| Motor Vehicle | Date of Title | Lienholder* |
|---|---|---|
| 2007 Chevrolet Truck (1GCHK39D07E111441) | 10/20/2006 | GMAC |
| 2007 Chevrolet Truck (1GCHK39D97E110708) | 10/20/2006 | GMAC |
| 2007 Chevrolet Truck (1GBHK39D47E121569) | 3/7/2007 | GMAC |
| 2006 Chevrolet Truck (1GCHK39D96E268786) | 7/18/2006 | GMAC (Paid Off) |
| 2006 Chevrolet Truck (1GCHK39296E103853) | 4/12/2006 | GMAC (Paid Off) |
| 2006 Chevrolet Truck (1GCHK39D76E277969) | 7/18/2006 | GMAC (Paid Off) |
| 2007 Chevrolet Truck (1GCHK39D77E137003) | 3/5/2007 | GMAC |
| 2007 Chevrolet Truck (1GCHK23DX7F184068) | 3/7/2007 | GMAC |
| 2007 Chevrolet Truck (1GCHK29U57E186677) | 3/7/2007 | GMAC |
| 2007 Chevrolet Truck (1GCHK39D47E136486) | 3/5/2007 | GMAC |
| 2006 Chevrolet Truck (1GCHK23D66F168173) | 7/18/2006 | GMAC |
| 2006 Chevrolet Truck (1GCHK39D06E266683) | 6/22/2006 | GMAC |

* All liens to be removed prior to Closing.

## Schedule 1.4
## Purchased Equipment Leases

| Unit Number | Year | Model | Type | |
|---|---|---|---|---|
| **Utility Equipment Leasing Company** | | | | |
| 8221 | 2007 | Ford 550 | Bucket Truck | |
| | | | Buyout Figure (estimated) | $32,000 |
| | | | | |
| **Scott Power Line Equipment** | | | | |
| 1364 | 2007 | Sky Lift | Mini Derrick | |
| | | | Buyout Figure (estimated) | $40,000 |
| | | | | |
| **Altec Lease #22901** | | | | |
| 41400 | 2000 | Freightliner | T40C Bucket Truck | |
| 9278 | 2000 | GMC | T40C Bucket Truck | |
| 9180 | 2000 | GMC | T40C Bucket Truck | |
| | | | | |
| **Altec Lease #25473-B** | | | | |
| 51346 | 2002 | Ford F-350 | AT200V Bucket Truck | |
| 46541 | 2005 | International 4300 | AT40C Bucket Truck | |
| 46697 | 2005 | International 4300 | AT40C Bucket Truck | |
| 49083 | 2000 | Ford F-750 | T40C Bucket Truck | |
| 65222 | 2006 | International 4300 | DM47 Digger Derrick | |
| 65228 | 2006 | International 7300 | DM47 Digger Derrick | |
| 53437 | 2004 | International 4300 | AA755-MH Bucket Truck | |
| | | | Buyout Figure (estimated) | $404,000 |
| | | | | |
| **Key Equipment Financing Schedule #1** | | | | |
| 9054 | 2005 | Chevrolet C-2500 | Pickup Truck | |
| 9056 | 2005 | Chevrolet C-2500 | Pickup Truck | |
| 3965 | 2006 | Chevrolet C-3500 | Pickup Truck | |

| | | | |
|---|---|---|---|
| 2890 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 9607 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 9081 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 8097 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 4598 | 2004 | International 7600 | Fassi F330B.24 Crane |

**Key Equipment Financing Schedule #2**

| | | | |
|---|---|---|---|
| 1705 | 2005 | New Holland | Backhoe |

**Key Equipment Financing Schedule #3**

| | | | |
|---|---|---|---|
| 0537T | 2006 | Chevrolet C-2500 | Pickup Truck |
| 9328 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 1746 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 3851 | 2006 | Ford F-450 | Bucket Truck |
| 7039 | 2006 | International 7400 | Pro Max Dump Truck |
| 7040 | 2006 | International 7400 | Pro Max Dump Truck |
| 2493 | 2005 | Butler | Pole Trailer |
| 2724 | 2005 | Butler | Pole Trailer |
| 2723 | 2005 | Butler | Pole Trailer |
| 2722 | 2005 | Butler | Pole Trailer |
| 2491 | 2005 | Butler | Reel Trailer |
| 2490 | 2005 | Butler | Reel Trailer |
| 2492 | 2005 | Butler | Reel Trailer |
| 2719 | 2005 | Butler | Reel Trailer |
| 2720 | 2005 | Butler | Reel Trailer |
| 2721 | 2005 | Butler | Reel Trailer |

**Key Equipment Financing Schedule #4**

| | | | |
|---|---|---|---|
| 5907 | | Chicago Pneumatic | Model 185 Air Compressor |
| 2920 | | Atlac Comcp | Model VAS185 Air Compressor |
| 1023 | 2005 | Bobcat | Model 430 Mini Excavator |

Key Equipment
Financing Schedule #5

| 334 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 1856 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 1411 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 8348 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 4921 | 2006 | | Equipment Trailer |
| | 1995 | | Track Mounted Digger Derrick |

Key Equipment
Financing Schedule #6

| 7598 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 4819 | 2006 | Chevrolet C-3500 | Pickup Truck |

**Buyout Figure (estimated)**    $400,000

**Schedule 2.1(m)**
**Property Plant and Equipment List**

| Equipment |
|---|
| 2005 Directional Drill (Unit #1354) |
| 1978 Derrick/Skidder (Unit #1462) |
| 1994 Air Compressor (Unit #0710) |
| 1983 Air Compressor (Unit #1464) |
| 2004 Rodding Machine (Unit #2559) |
| 1973 Rodding Machine (Unit #7291) |
| 2005 Vermeer Drop Plow (Unit #2437) |
| 2000 Vermeer Drop Plow (Unit #2258) |
| 2003 Vermeer Drop Plow (Unit #2301) |
| 2000 Vermeer Drop Plow (Unit #1983) |
| 1998 Vermeer Drop Plow (Unit #1067) |
| 1995 Vermeer Drop Plow (Unit #3046) |
| 1995 Case Plow (Unit #2455) |
| 1995 Case Plow (Unit #2454) |
| 1995 Case Plow (Unit #5048) |
| 2003 John Deere Backhoe (Unit #4253) |
| 2000 John Deere Backhoe (Unit #2524) |
| 1994 Ford Backhoe (Unit #O433) |
| 2004 Toyota Forklift (Unit #0109) |
| 1995 Clark Forklift (Unit #9488) |
| 1990 Clark Forklift (Unit #7412) |
| 1995 Yale Forklift (Unit #5456) |
| 1980 Ryan Cable Plow (Unit #OOO7) |
| 2002 Honda 4-Wheeler (Unit #9134) |
| 1997 Honda 4-Wheeler (Unit #8485) |
| 2005 Honda 4-Wheeler (Unit #7635) |
| 1998 Cub w/Rototiller (Unit #2014) |
| 2001 Morbark Chipper (Unit #0084) |
| Bore Machine |
| Bore Machine |
| |
| **Office Equipment, Furnishings, & Supplies** |
| |
| Inspiron 600M Notebook Computer |
| Dimension 5100 Desktop Computer |
| Inspiron 1525 Notebook Computer |
| Inspiron 6000 Notebook Computer |
| Dimension 8200 Desktop Computer |
| Precision Workstation 210 Desktop Computer |
| Latitude D600 Notebook Computer |
| Poweredge 1600 SC Win 2000 Server |
| Poweredge 2400 Win NT Server |
| Dimension 5150 Desktop Computer |

| |
|---|
| OptiPlex GX110 Desktop Computer |
| Inpiron 9300 Notebook Computer |
| Dimension 1100/B110 Desktop Computer |
| OptiPlex 745 Desktop Computer |
| OptiPlex 745 Desktop Computer |
| OptiPlex 745 Desktop Computer |
| OptiPlex 745 Desktop Computer |
| Dimension 5150/E510 Desktop Computer |
| Dimension 5150/E510 Desktop Computer |
| Dimension 5150/E510 Desktop Computer |
| Power Edge SC440 Server |
| Dimension 4550 Desktop Computer |
| Dimension 5150/E510 Desktop Computer |
| Dimension V4333c Desktop Computer |
| Optiplex GX260 Desktops |
| XPS M1330 Notebook Computer |
| Latitude D810 Notebook Computer |
| Dimension 4300 Desktop Computer |
| Optiplex GX110 Warehouse Scanner |
| V4333c Warehouse UPS |
| Dimension 8300 Desktop Computer |
| Dimension 9100 Desktop Computer |
| Precision Workstation 340 Desktop Computer |
| Latitude D520 Notebook Computer |
| Dimension 5150/E510 Desktop Computer |
| Inspiron 9300  Notebook Computer |
| Dimension 5100 Desktop Computer |
| XPS M1710 Notebook Computer |
| Notebook Computer |
| Notebook Computer |
| Latitude D520 Notebook Computer |
| XPS M1730 Notebook Computer |
| Power Edge 2900 Server |
| Power Edge 1900 Server |
| Power Edge 2400 Backup Server |
| Dimension 9200/XPS 410 Desktop Computer |
| Dimension 8200 Desktop Computer |
| B.Q. Accpac Server |
| Precision Workstation 210 Desktop Computer |
| Inspiron 600M Notebook Computer |
| Dimension 8300 Desktop Computer |
| Latitude D830 Notebook Computer |
| Inspiron 1521 Notebook Computer |
| Latitude D520 Notebook Computer |
| Axim X50 (Electronics) |
| Axim X50 (Electronics) |
| Axim X50 (Electronics) |
| Axim X50 (Electronics) |

| |
|---|
| Axim X51 (Electronics) |
| Customer Kits 2005-2008 (Non-Tied Peripherals) |
| DellWare (Fullfillment) (Non-Tied Peripherals) |
| Spare Parts (Piece Parts) (Non-Tied Peripherals) |
| Service SKU (Non-Tied Peripherals) |
| Customer Kits (Non-Tied Peripherals) |
| 5 Desks |
| 20 Chairs |
| Copier/Fax Stand |
| 8 Desks |
| 15 Chairs |
| Conference Table |
| Copier/Fax Stand |
| 8 Desks |
| 10 Chairs |
| Conference Table |
| 3 Desks |
| 6 Chairs |
| 5 Desks |
| 12 Chairs |
| Drafting Table |
| Copier/Fax Stand |
| 7 Work Stations |
| 15 Desks |
| 35 Chairs |
| Conference Table |
| Drafting Table |
| Misc. Credenzas and tables |

**Schedule 8.2(d)**
**Confidentiality Agreement**

5164 Normandy Park Dr. • Suite 285 • Medina, Ohio 44256 • Phone 330-721-1990 • Fax 330-721-1991

*June* **25,** 2009

*Personal & Confidential*

The Ardmore Group LLC
1211 W. Long Lake Rd
Bloomfield Hills, MI 48304

Dear *Mr Godfrey* :

You have expressed interest in pursuing a possible investment in or acquisition of a service provider of utility line repairs and related construction services, identified as Client #2158 (the "Company"). You understand that MelCap Partners, LLC is representing the Company as its exclusive investment banker and financial advisor ("Agent") and will be providing you Confidential Information (as defined below) on behalf of the Company solely to assist you in evaluating this opportunity.

In consideration for and as a condition to the Company's furnishing you with the Confidential Information, you agree to the terms and conditions set forth in this letter agreement:

(1) You acknowledge the confidential and proprietary nature of the Confidential Information (as defined below), and agree to hold and keep the Confidential Information as provided in this letter agreement, and otherwise agree to each and every restriction and obligation in this letter agreement. All information furnished to you by the Company or its representatives prior to, on or after the date hereof shall be subject to the terms of this letter agreement. As used in this letter agreement, the term "Confidential Information" means all nonpublic information relating to the Company or its business. Confidential Information does not include information which: (i) is or becomes generally available to the public other than as a result of a disclosure by you in violation of the terms of this agreement; or (ii) was within your possession prior to it being furnished to you by the Company or its representatives pursuant hereto, provided that the source of such information was not bound by a confidential agreement with respect to such information.

(2) You agree that the Confidential Information (a) will be kept confidential by you and (b) without limiting the foregoing, you will not disclose any of the Confidential Information now or hereafter received or obtained by you from the Company or Agent to any third party, without the prior consent of the Company; provided, however, that any such information may be disclosed to your directors, officers, agents, employees, principals, advisors, financing sources, and other representatives ("your Representatives") who need to know such information solely for the purpose of evaluating a possible investment in or acquisition of the Company. Your Representatives shall be obligated to treat such information confidentially and in accordance with the restrictions and terms of this letter agreement, and you agree that you will be responsible for any failure by any of your Representatives, whether current or former, to comply with the provisions of this letter agreement. You also agree to be responsible for enforcing this letter agreement as to your Representatives and to take such action as is necessary to cause them to comply with this letter agreement.

(3) In addition, without the prior consent of the Company, neither you nor your Representatives will disclose to any person either the fact that discussions or negotiations are taking place concerning a possible transaction with the Company or any terms, conditions or other facts related to any such possible transaction including the status thereof or that Confidential Information has been disclosed to you.

(4) If you or any of your Representatives become legally compelled to make any disclosure that is prohibited or otherwise constrained by this letter agreement, you or your Representatives, as the case may be, will provide the Company and Agent with prompt notice of such legal proceedings so that the Company may seek an appropriate protective order or other appropriate relief, or waive compliance with the provisions of this letter agreement.



5164 Normandy Park Dr. • Suite 285 • Medina, Ohio 44256 • Phone 330-721-1990 • Fax 330-721-1991

(5) You recognize and acknowledge the competitive value and confidential nature of all Confidential Information now or hereafter furnished to you or obtained from the Company or the Company's directors, officers, employees, agents, consultants, advisors, Agent and other representatives (collectively, the "Company Reps") and the irreparable injury which would result to the Company if any of this information were disclosed to any third party in contravention of the terms of this letter agreement. In this regard, you acknowledge that an award of money damages may be inadequate for any breach of this letter agreement, and you consent to the imposition of injunctive or other equitable relief. Such remedies will not be the exclusive remedies for any breach of this letter agreement, but will be in addition to all other remedies available at law or equity to the Company.

(6) You are not to initiate, contact or engage in discussions, directly or indirectly, with any employees of the Company without the prior consent of the Company. Furthermore, unless you acquire the Company, you also agree not to hire or solicit (excluding general solicitations or advertisements not specifically directed to employees of the Company) for employment any employees of the Company without the consent of the Company.

(7) The Company reserves the right, in its sole discretion, to reject any and all proposals made by you with regard to a transaction and to terminate negotiations and discussions with you and your Representatives at any time.

(8) It is understood by you and your Representatives that neither the Company, Agent nor the Company Reps make any representation or warranty (express or implied) as to the completeness or accuracy as to the Confidential Information received by you. Any and all representations and warranties shall be made solely by the Company in a definitive purchase agreement and subject to the provisions therein. All Confidential Information disclosed under this letter agreement remains the property of the Company. You agree that no license under any invention, patent, copyright, trade secret or other proprietary right is granted to you by this letter agreement.

(9) All Confidential Information now or hereafter received or obtained by you or your Representatives from the Company (and all copies, summaries, and notes of the contents or parts thereof), shall be returned to the Company or destroyed with written confirmation and not retained by you or your Representatives in any form or for any reason, promptly upon the election of the Company or you, not to proceed with the transaction contemplated by this letter, and you and your Representatives will destroy materials generated by you or your Representatives that include or refer to any part of the Confidential Information, without retaining a copy of any such material.

(10) The Company is a third party beneficiary of this letter agreement and may enforce the terms of this letter agreement against you and your Representatives.

(11) This letter agreement will be governed by the laws of the State of Pennsylvania without regard to conflicts-of-laws principles.

(12) This agreement shall terminate 2 years from the execution date hereof.

If you are in agreement with the foregoing, please sign and return one copy of this letter agreement, which thereupon will constitute our agreement with respect to its subject matter.

Sincerely yours,

MelCap Partners, LLC

Albert D. Melchiorre
President
Agent of the Company

ACCEPTED AND AGREED
As of this 25 day of June , 2009

By: _____ Godfrey, The Andreas Group

Its: _____ President