# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                                          :
                                                : Case No. 08-11904(TPA)
THAYER POWER AND COMMUNICATION                  : Judge Agresti
LINE CONSTRUCTION COMPANY,                      :
                                                :
     Movant,                                   : Chapter 11
                                                :
     v.                                        : Docket No.
                                                :
THE ANDERSON GROUP, LLC;                        : Related Docket No. 302, 337 &
KEYBANK, N.A.; UNITED STATES OF                 : 377
AMERICA, INTERNAL REVENUE SERVICE;              :
THE COMMONWEALTH OF PENNSYLVANIA,               :
OFFICE OF THE ATTORNEY GENERAL; AND             : Hearing Date: February 19,
THE OFFICIAL COMMITTEE OF UNSECURED             : 2010, at 10:00 a.m.
CREDITORS,                                      :
                                                :
     Respondents.                              :
                                                :
_____:


### SARGENT ELECTRIC COMPANY'S REVISED ASSET PURCHASE AGREEMENT/BID IN ACCORDANCE WITH THE AMENDMENTS TO THE ASSET PURCHASE AGREEMENT/BID MADE BY SARGENT ELECTRIC COMPANY AT THE HEARING HELD ON FEBRUARY 12, 2010

### REDLINE COPY

Respectfully submitted,

LEECH TISHMAN FUSCALDO & LAMPL, LLC

Dated: 2/18/2010

By: /s/ John M. Steiner
     David W. Lampl, Esq.
     PA I.D. No. 28900
     John M. Steiner, Esquire
     Pa. I.D. No. 79390
     525 William Penn Place, 30th Floor
     Pittsburgh, PA 15219
     (412) 261-1600
     Counsel for Sargent Electric
     Company

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is entered into as of February __, 2010, by and between THAYER POWER & COMMUNICATION LINE CONSTRUCTION CO., INC. (the "Seller") and SARGENT ELECTRIC COMPANY or its assigns (the "Purchaser"). Seller and Purchaser may be referred to herein individually as a "Party" or collectively as the "Parties."

WHEREAS, on October 4, 2008 (the "Petition Date"), Seller filed a voluntary Chapter 11 petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Western District of Pennsylvania, Erie Division, at Case No. 08-11904 (TPA) (the "Bankruptcy Court");

WHEREAS, Seller wishes to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 363 and 365 and other applicable provisions of the Bankruptcy Code and the Bidding Procedures ordered by the Bankruptcy Court, all of the Assets (as defined below), together with the Assumed Liabilities (as defined below) of Seller upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, Purchaser wishes to purchase and take delivery of such Assets and Assumed Liabilities upon such terms and subject to such conditions; and

WHEREAS, Purchaser requires that the Assets be sold pursuant to a Sale Order (as defined below) of the Bankruptcy Court approving the sale under Section 363 of the Bankruptcy Code and authorizing the assumption and assignment of certain executory contracts, unexpired leases and related liabilities, if any, pursuant to Section 365 of the Bankruptcy Code and the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual promises herein, and in consideration of the representations, warranties, and covenants herein, the Parties agree as follows:

## ARTICLE I
## PURCHASE OF ASSETS

1.1　　Assets to be Sold. Upon the terms and subject to the conditions set forth in this Agreement, Seller shall sell, convey, assign, transfer and deliver to Purchaser, free and clear of all liens, claims, encumbrances and Purchaser shall purchase and acquire from Seller, Seller's right, title and interest in and to all Seller's property and assets, tangible and intangible, including the following (but excluding the Excluded Assets (as defined below)):

(a)　　all tangible personal property of Seller, including without limitation, all furniture, computers, servers, small tools and equipment used in the normal course of business and other equipment including, but not limited to, all of the property listed in Schedule 2.1(m);

(b)　　all inventory of Seller, and Purchaser intends to liquidate the inventory (the "Inventory") after the Closing (defined below), provided, that if the Inventory is liquidated for more than One Hundred Thousand Dollars ($100,000.00), the Purchaser will remit all of the excess proceeds (i.e.,

| Deleted: surplus |
| Deleted: originally purchased by Seller for the Windstream contracts |
| Deleted: Windstream |
| Deleted: Windstream |

net proceeds in excess of $100,000.00) (the "Inventory Proceeds") to the Seller within five (5) business days of Purchaser's receipt of such Inventory Proceeds;

(c) all accounts receivable (the "Accounts Receivable") excluding any accounts receivable aged ninety (90) days or more as of the Closing Date (defined below) (the "Excluded Receivables") and all of the work in progress that has not yet been invoiced to customers or otherwise converted into Accounts Receivable;

(d) all rights of Seller in any prepaid expenses, including all deposits paid to Seller's suppliers and utility providers, and claims for refunds and rights to offset in respect thereof;

(e) any executory contracts or unexpired leases (the "Seller Contracts") listed on Schedule 1.1(e) hereto as approved pursuant to Section 365 of the Bankruptcy Code (the "Assumed Contracts");

(f) all licenses, permits and governmental authorizations and all pending applications therefore or renewals thereof, in each case to the extent, if any, they are transferable to Purchaser;

(g) all data and records related to the operations of Seller, including client and customer lists and records, referral sources, research and development reports and records, production reports and records, service and warranty records, equipment logs, operating guides and manuals, financial and accounting records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and records, provided however, that for the greater of (I) three years after the Closing Date (defined below) or (II) two years after the Bankruptcy Court enters an order closing Seller's Bankruptcy Case, Purchaser shall grant Seller or the Thayer Brothers (as defined below) access to any information described in this paragraph that Seller or the Thayer Brothers deem reasonably necessary in connection with, *inter alia*, Seller's bankruptcy proceeding, Seller's or Thayer Brothers' tax related issues or to pursue Seller's claims, causes of action, choices of action and rights of recovery and Seller or Thayer Brothers shall reimburse Purchaser for any reasonable out-of-pocket expenses incurred by Purchaser in providing such access;

(h) all of the intangible rights and property of Seller, bids and quotations for new work or extensions to existing contracts that have been submitted by Seller but have not yet resulted in contracts with customers, good-will, telephone and telecopy numbers, and email addresses and websites;

(i) all intellectual property rights of Seller including, without limitation, all rights in and to the company name, trademarks, service marks, trade names, trade dress, domain names and other names and brand identifiers held or used by Seller and the applications, registrations and all filings associated therewith;

(j) all of Seller's rights under any insurance policies under which Seller is a beneficiary;

(k) all of Seller's rights under any non-disclosure, confidentiality, non-compete or non-solicitation agreement with employees, contractors or agents of Seller, or with third parties, that relate to Seller's business or the Assets;

(l) all of Seller owned vehicles listed in Schedule 1.1(l);

(m)     all of the James Thayer owned vehicles (the "Thayer Vehicles") listed on Schedule 1.1(m); and

(collectively, all of the items in (a)-(m), the "Assets").

1.2     Excluded Assets.  Notwithstanding anything to the contrary contained in Section 1.1 or elsewhere in this Agreement, the following assets of Seller (collectively, the "Excluded Assets") are not part of the sale and purchase contemplated hereunder, are excluded from the Assets, and shall remain the property of Seller after the closing:

(a)     all Seller Contracts that are not Assumed Contracts or Purchased Equipment Leases (defined below);

(b)     all claims for refund of taxes and other governmental charges of whatever nature (including any interest related thereto);

(c)     all rights of Seller under this Agreement;

(d)     Seller's corporate seals, stock record books, corporate record books containing minutes of meetings of directors and stockholders; tax returns and records, books of account and ledgers of such other records having to do solely with Seller's organization or stock capitalization or Excluded Assets or Excluded Liabilities (as defined below);

(e)     all personnel records and other records;

(f)     claims against third parties including, but not limited to, Seller's claims, causes of action, choices of action and rights of recovery pursuant to Sections 544 through 550 and Section 553 of the Bankruptcy Code and any other avoidance actions under any other applicable provisions of the Bankruptcy Code;

(g)     cash on hand; and

(h)     the Excluded Receivables.

1.3     Consideration.  The Purchaser will purchase the Assets (including the Assumed Contracts and Purchased Equipment Leases defined in Article 1.4 below) for the following total consideration: (a) Two Million Five Hundred Thousand Dollars ($2,500,000.00) cash, based upon Schedule 1.3(a) (the Debtor's balance sheet as of September 30, 2009) and Schedules 2.1(m), 1.1(l), and 1.1(m) (the "Cash Purchase Price"); (b) Zero Dollars ($0.00) cash for the cure costs for the Assumed Contracts set forth on Schedule 1.1(e) (the "Assumed Cure Amounts"); (c) up to Four Hundred Fifteen Thousand Dollars ($415,000.00) cash for post-petition administrative expenses of the Seller's bankruptcy estate, the exact amount of which is to be determined at the time of Closing (the "Administrative Expense Fund"); (d) any Inventory Proceeds as defined in Article 1.1(b) above; (e) Four Hundred Thousand Dollars ($400,000.00) cash for the Purchased Equipment Leases (defined in Article 1.4 below), (f) Two Hundred Fifty Thousand Dollars ($250,000.00) cash to be paid first for the priority claims of the unions and the union trust funds that were not paid from the interim payments of $15,000.00 per month made pursuant to the Order dated May 4, 2009, the exact amount of the priority claims is to be determined by the Bankruptcy Court, with the remaining funds to be allocated to the creditors by the Bankruptcy Court (the "Union Priority Fund"),

Deleted: Ten Thousand Seven Hundred Thirty-One

Deleted: and Eighty-two Cents

Deleted: 10,731.82

Deleted: Three

Deleted: y

Deleted: 350

Deleted: One

Deleted: 1

3

and (g) Thirty Thousand Dollars ($30,000.00) cash for the unsecured creditors (the "Unsecured Creditors Fund") and 5% of allowed rejection damage claims, if any, asserted by Utility Equipment Leasing Company, Scott Power Line Equipment, Altec and MIRK, Inc. in excess of the net value of any of the equipment that is the subject of the leases set forth in Schedule 1.4 (as amended) of the Stalking Horse APA (the "Additional Unsecured Creditors Fund") (collectively, the Cash Purchase Price, the Assumed Cure Amounts, the Administrative Expense Fund, the Inventory Proceeds, the Purchased Equipment Leases, the Union Priority Fund, the Unsecured Creditors Fund and the Additional Unsecured Creditors Fund shall be referred to hereinafter as the "Purchase Price"). The Purchaser shall pay the Cash Purchase Price (subject to the reserves set forth in Section 1.7(b) below), the Assumed Cure Amounts, the Administrative Expense Fund, the Union Priority Fund and the Unsecured Creditors Fund at Closing. The Inventory Proceeds, if any, shall be paid within ten (10) days of the liquidation of the Inventory. The Purchased Equipment Leases will be paid upon the transfer of title to Purchaser for that equipment. The Additional Unsecured Creditors Fund will be paid upon a final order and/or determination on the allowed amount of any rejection damage claim asserted by Utility Equipment Leasing Company, Scott Power Line Equipment, Altec and MIRK, Inc. in excess of the net value of any of the equipment that is the subject of the leases set forth in Schedule 1.4 (as amended) of the Stalking Horse APA.

1.3.1    Adjustment.    The Cash Purchase Price is based upon Seller's balance sheet as of September 30, 2009, a true and correct copy which is attached hereto as Schedule 1.3(a) (the "September 30 Statement") and Schedules 2.1(m), 1.1(l), and 1.1(m). Subject to Article XI, the Cash Purchase Price will be adjusted upwards or downwards, dollar-for-dollar, as of the Closing Date to reflect any changes in Seller's Current Assets (the "Current Assets Adjustment") from the September 30 Statement against the Current Assets on the Closing Date. The term "Current Assets" shall mean all of Seller's Accounts Receivable excluding the Excluded Receivables. In addition, the Cash Purchase Price shall be adjusted downwards if any of the property, plant, vehicles or equipment listed on the September 30 Statement and on Schedules 2.1(m), 1.1(l), and 1.1(m) (collectively, the "Equipment") is sold, lost or otherwise disposed of before the Closing (the, "Additional Adjustment", together with the Current Assets Adjustment, the "Closing Adjustments").

1.3.2    Allocation.    On the Closing Date, the parties will agree to a Certificate of Allocation setting forth the allocation of the Purchase Price among the Assets which will be binding and conclusive on the parties for all purposes including for reporting to any taxing authority.

1.4    Purchased Equipment Leases.    To benefit the Seller's bankruptcy estate, Purchaser will purchase the equipment leased by Seller pursuant to the leases as described on Schedule 1.4 hereto by way of a negotiated buy out of each such lease upon terms satisfactory to Purchaser (collectively, the "Purchased Equipment Leases").

1.5    Assumed Liabilities.    Incident to the purchase of the Assets and as part of the Purchase Price, Purchaser shall assume and become responsible for and shall thereafter pay, perform and discharge in accordance with their terms, any liability arising on and after the Closing Date under the Assumed Contracts, and the Assumed Cure Amounts (collectively, the "Assumed Liabilities").

1.6    Retained Liabilities.    Seller shall remain solely responsible for all liabilities that are not Assumed Liabilities (the "Retained Liabilities").

4

1.7   Deposit; Reserves.  (a) An earnest money deposit (the "Deposit") in the amount of Two Hundred Thousand Dollars ($200,000.00) has been paid by Purchaser into Seller's counsel's non-interest bearing IOLTA trust account.  The Deposit will be credited against the Purchase Price at Closing, and disbursed as set forth in paragraph (b) below.  Subject to Section 9.2, the Deposit shall be refunded to Purchaser in the event the transaction does not close, whether as a result of failure to satisfy the conditions to Closing set forth in Article VII, Purchaser not being the Successful Bidder (as defined in the Bid Procedures Order) at the Bankruptcy Sale, or any other reason other than a breach of this Agreement by Purchaser.

(b)   The following amounts from the Cash Purchase Price shall be held in reserve in Seller's counsel's non-interest bearing IOLTA trust account, to be disbursed as follows:

(i) Four Hundred Thousand Dollars ($400,000.00), comprised of the Deposit plus an additional Two Hundred Thousand Dollars ($200,000.00), shall be disbursed at such time as the Closing Adjustments and Post Closing Adjustment have been agreed upon and made pursuant to the provisions of Article 1.3.1 and Article XI.

(ii) Two Hundred Thousand Dollars ($200,000.00) shall be disbursed at such time as Seller has paid in full all post-petition amounts, including but not limited to wages and benefits, owed by Seller to its employees up to the Closing Date.

1.8   Closing.  The Closing of the sale contemplated by this Agreement (the "Closing" or "Closing Date") shall take place at the offices of the Quinn Law Firm, in Erie, Pennsylvania, and shall occur consistent with timetables established by the Bankruptcy Court which are reasonably satisfactory to Seller and Purchaser, but in any event not later than February 19, 2010.

Deleted:     15.

1.9   Collection of Accounts Receivable.  On behalf of Seller, Purchaser will use its best efforts to collect the Excluded Receivables for a period of sixty (60) days after Closing and will deposit such collections at the direction of Seller and/or the Bankruptcy Court. Seller shall cooperate with Purchaser in collecting the Excluded Receivables.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER

2.1   Seller represents, warrants and covenants to Purchaser as follows:

(a)   Seller owns the Assets and, if Purchaser is the Successful Bidder at the Bankruptcy Sale, will transfer all of the Assets to Purchaser at the Closing, free and clear of all liens, claims encumbrances, and/or other obligations, consistent with the provisions of the Bankruptcy Code;

(b)   Subject to Bankruptcy Court approval, Seller has the corporate power, legal capacity and authority to enter into and perform its obligations under this Agreement, and all other agreements to which Seller is or will be a party that are required in order to consummate the transaction contemplated by this Agreement. The execution, delivery and performance of this Agreement has been duly and validly approved and authorized by all necessary corporate action on the part of Seller and no other approval (other than Bankruptcy Court approval) is required in connection with the consummation of the transaction contemplated hereby;

(c)     Seller will seek entry of the Sale Order (defined in Article 7.6 below) approving the sale and this Agreement and finding that Purchaser has purchased the Assets for reasonably equivalent value, in good faith pursuant to the terms of Section 363(m) of the Bankruptcy Code, and free and clear of all liens, claims and encumbrances;

(d)     Except as contained in Section 1.5 herein and Schedule 1.1(e), there are no obligations and/or liabilities of Seller contingent or otherwise being assumed by Purchaser, including without limitation, obligations relating to employees, union contracts, and pension liabilities;

(e)     Except as otherwise disclosed, Seller knows of no fact or event which does, or with the passage of time may, have a materially adverse effect on the Assets or on Seller's business or its prospects;

(f)     Unless otherwise disclosed, Seller has not been cited for any OSHA, EPA and/or any other governmental violation (including without limitation violation of any environmental law or regulation) and to the best of Seller's knowledge, there is no fact or event which, with the passage of time, will give cause to a violation of any of the above;

(g)     Except as otherwise disclosed, Seller has not been cited for any unfair labor act nor to the best of Seller's knowledge is there any fact or circumstance which exists that would give rise to an unfair labor act;

(h)     There are no actions, suits, proceedings or investigations pending or to the best of Seller's knowledge threatened against Seller which may have a material adverse impact on Seller, the Assets, or Seller's business prospects;

(i)     The unaudited financial statements of Seller for the period ending December 31, 2008 and September 30, 2009 fairly reflect the financial condition of Seller's business and the results of operations through those dates;

(j)     The Assets to be acquired by Purchaser will include all assets and properties owned by Seller as set forth herein, and collectively with the equipment subject to the Purchased Equipment Leases and the monthly equipment leases with Utility Equipment Leasing Company and MIRK, Inc. represent all of the assets necessary for the operation and conduct of Seller's business in a manner consistent with the past practices, including, the existing real estate leases with respect to Seller's business locations, which leases shall be assumed by Seller and assigned to Purchaser if listed as Assumed Contracts on Schedule 1.1(e) hereto;

(k)     The Accounts Receivable will be real and valid and will have been created in the Company's normal course of business. Bad debt reserves will be computed consistent with past practices;

(l)     Inventory reserves will be computed consistent with past practices;

(m)     Property, plant and equipment will be on hand in the quantities listed on Schedule 2.1(m) hereto as well as all small tools not listed but purchased by Seller for the conduct of business;

(n)     Except as otherwise disclosed, Seller has not lost any material suppliers or material customers; and,

(o)     All of the representations and warranties shall be true at Closing.

2.2     These representations and warranties will survive only until the Closing after which they are void.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

3.1     Purchaser represents, warrants and covenants to Seller as follows::

(a)     Purchaser is duly organized, validly existing and in good standing under the laws of its state of incorporation and is authorized to carry out the transaction contemplated by this Agreement;

(b)     Purchaser has the ability and intention to consummate the transaction contemplated by this Agreement;

(c)     Purchaser has the corporate power, legal capacity and authority to enter into and perform its obligations under this Agreement, and all agreements to which Purchaser is or will be a party that are required to be executed in order to consummate the transaction contemplated by this Agreement. The execution, delivery and performance of this Agreement has been duly and validly approved and authorized by person(s) so authorized by Purchaser. The execution and delivery of this Agreement and the consummation of the transaction contemplated hereby have been duly authorized by all necessary corporate action on the part of Purchaser and no other approval is required in connection with the consummation of the transaction contemplated hereby.

(d)     Except for entry of the Sale Order and any consent required for the Assumed Contracts, no consent, approval, order or authorization of, or registration, declaration or filing with any governmental authority or other person or entity is required to be obtained or made by Purchaser in connection with the execution and delivery of this Agreement or the consummation of the transaction contemplated hereby.

(e)     This Agreement is, or when executed by Purchaser and the other parties hereto will be, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its terms, except as to the effect, if any, of applicable bankruptcy law.

(f)     Neither the execution and delivery of this Agreement nor the consummation of the transaction provided for herein, will conflict with or result in a termination, breach, impairment or violation of: (i) any provisions of Purchaser's charter documents, as currently in effect; or (ii) any order or legal requirement of a governmental authority applicable to Purchaser or any of its assets or properties.

(g)     Purchaser will acquire the Assets for the purposes of investment and not with a view to offering the same for sale in connection with any distribution thereof.

3.2 All of the representations of Purchaser shall be true at Closing.

3.3 These representations and warranties will survive only until the Closing after which they are void.

# ARTICLE IV
## SELLER COVENANTS

4.1 _Advice of Changes._ During the period from the date of this Agreement until the earlier to occur of the Closing Date or the termination of this Agreement in accordance with the provisions of Article IX hereof, Seller will promptly advise Purchaser in writing of: (a) the discovery by Seller of any event, condition, fact or circumstance occurring on or prior to the date of this Agreement that would render any representation or warranty by Seller contained in this Agreement untrue or inaccurate in any material respect; (b) any event, condition, fact or circumstance occurring subsequent to the date of this Agreement that would render any representation or warranty by Seller contained in this Agreement, if made on or as of the Closing Date (provided that representations and warranties which are confined to a specific date shall speak as of that date), untrue or inaccurate in any material respect; (c) any breach of any covenant or obligation of Seller pursuant to this Agreement; and (d) any event, condition, fact or circumstance that is reasonably likely to make the timely satisfaction of any of the conditions set forth in Article VII impossible or unlikely.

4.2 _Conduct of Business._ Up to and including the Closing Date, Seller and its management team shall conduct operations of Seller only in the ordinary course of business and will not take any of the following actions, except to the extent authorized by the Bankruptcy Court after notice and a hearing which includes notice to Purchaser:

(a) sell, assign, lease or transfer any of its Assets, except in the ordinary course of business;

(b) permit any of its shares of stock to be sold, redeemed or transferred;

(c) permit any of its Assets or shares of stock to become subject to any lien, security interest or other encumbrances of any kind of nature, to which they are not subject as of the date of this Agreement (as previously disclosed to Purchaser);

(d) issue additional shares of stock or participate in any merger or plan of share exchange;

(e) enter into, modify or terminate any contract, instrument, license or permit relating to its business, customers, or creditors, except in the ordinary course of business;

(f) hire or terminate any of its employees, except for cause or in the ordinary course of business;

(g) pay, declare or accrue any bonuses, increases in salaries or compensation for services, except in the ordinary course of business;

(h) incur any indebtedness except in the ordinary course of general business purposes;

8

(i) except in the normal course of business, lend any funds, extend any credit or grant any discounts to any person or entity;

(j) engage in any transaction with any related or affiliated party, except in the ordinary course of business; or

(k) make any distributions or pay any dividends with respect to the stock of Seller or make any other distributions to the shareholders of any kind except either for salary in the normal course of business or to pay estimated federal and state income taxes on any earnings of Seller.

4.3     Litigation.  Seller will notify Purchaser in writing promptly after learning of any proceeding by or before any governmental authority, or other litigation initiated or threatened against Seller relating to the business of Seller or the Assets or for the purpose or with the effect of enjoining or preventing the consummation of the transaction contemplated by this Agreement, or which, if adversely determined, would be reasonably expected to have a material adverse effect on Seller or its business prospects.

4.4     Satisfaction of Closing Conditions.  Subject to the terms and conditions of this Agreement, Seller will use its commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of third parties and to make all filing with, and give all notices to, third parties that may be necessary or reasonably required on its part in order to effect the transactions contemplated hereby.

4.5     Regulatory Approvals.  Seller shall execute and file, or join in the execution of filing of, any application or other document required to be filed or as specifically requested by Purchaser.

## ARTICLE V
## PURCHASER COVENANTS

5.1     Advice of Changes.  During the period from the date of this Agreement until the earlier to occur of the Closing Date or the termination of this Agreement in accordance with the provisions of Article IX hereof, Purchaser will promptly advise Seller in writing of: (a) the discovery by Purchaser of any event, condition, fact or circumstance occurring on or prior to the date of this Agreement that would render any representation or warranty by Purchaser contained in this Agreement untrue or inaccurate in any material respect; (b) any event, condition or fact or circumstance occurring subsequent to the date of this Agreement that would render any representation or warranty by Purchaser contained in this Agreement, if made on or as of the Closing Date (provided that the representations and warranties which are confined to a specific date shall speak only as of such date), untrue or inaccurate in any material respect; (c) any breach of any convent or obligation of Purchaser pursuant to this Agreement; and (d) any event, condition, fact or circumstance that is reasonably likely to make the timely satisfaction of any of the conditions set forth in Article VI impossible or unlikely.

5.2     Regulatory Approvals.  Purchaser will execute and file, or join in the execution and filing of, any application or other document that may be necessary in order to obtain any governmental authorization, which may reasonably required, or which Seller may reasonably request, in connection with

the consummation of the transactions provided for in this Agreement. Purchaser will use commercially reasonable efforts to obtain all such governmental authorizations.

5.3     Litigation. Purchaser will notify Seller in writing promptly after learning of any proceeding threatened or pending for the purpose or with the probable effect of enjoining or preventing the consummation of the transaction contemplated by this Agreement, or which would be reasonably expected to have a material adverse effect on the transaction contemplated by this Agreement.

5.4     Satisfaction of Conditions Precedent. Upon the terms and subject to the conditions of this Agreement, Purchaser will use commercially reasonable efforts to cause the transaction contemplated by this Agreement to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of third parties and to make all filings with, and give all notices to, third parties that may be necessary or reasonably required on its part in order to effect the transaction provided for herein.

## ARTICLE VI
## CONDITIONS TO OBLIGATIONS OF SELLER

Seller's obligations hereunder are subject to the fulfillment or satisfaction, on and as of the Closing Date, each of the following conditions (any one or more of which may be waived by Seller, but only in writing signed on behalf of Seller by an authorized agent):

6.1     Accuracy of Representations and Warranties. Each of the representations and warranties of Purchaser set forth in Article III of this Agreement shall be true and correct in all material respects on and as of the date hereof and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except that to the extent such representations and warranties shall, to such extent, be true and correct as of the date hereof and on and as of such particular date as if made on and as of such particular date.

6.2     Covenants. Purchaser shall have performed and complied in all material respects with all of its covenants contained in Article V on or before the Closing Date.

6.3     Compliance with Law. There shall be no order by any governmental authority or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

6.4     Absence of Litigation. No proceeding shall be pending which could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms, of the transaction provided for in this Agreement.

6.5     Sale Order. The Bankruptcy Court shall have entered the Sale Order (as defined below).

6.6     Other Deliveries. Purchaser shall have delivered to Seller any other documents necessary to consummate the transaction contemplated by this Agreement.

## ARTICLE VII
## CONDITIONS TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser hereunder are subject to the fulfillment or satisfaction on, and as of the Closing Date, of each of the following conditions (any one or more of which may be waived by Purchaser, but only in a writing signed on behalf of Purchaser by an authorized agent):

7.1     Accuracy of Representations and Warranties. Each of the representations and warranties of Seller set forth in Article II of this Agreement shall be true and correct in all material respects on and as of the date hereof and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except that to the extent such representations and warranties shall, to such extent, be true and correct as of the date hereof and on and as of such particular date as if made on and as of such particular date.

7.2     Covenants. Seller shall have performed and complied in all material respects with all of its covenants contained in Article IV on or before the Closing Date.

11

7.3    Compliance with Law. There shall be no order by any governmental authority or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

7.4    Absence of Litigation. No proceeding shall be pending which could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms, of any of the transactions provided for in this Agreement.

7.5    Not Used.

7.6    Sale Order. The Sale Order shall be in a form and substance acceptable to Purchaser and shall have been entered by the Bankruptcy Court approving the sale to Purchaser in accordance with this Agreement and there shall have been no order entered staying the Sale Order. A copy of the Sale Order is attached hereto as Schedule 7.6. The Purchaser reserves the right, when and if necessary, to amend the Sale Order up to and at the time of the hearing held by the Bankruptcy Court to approve the sale and this Agreement.

7.7    Other Deliveries. Seller shall have delivered to Purchaser the following:

(a)    a customary bill of sale for all of the Assets, duly executed by Seller; and

(b)    The assignment of the customer contracts and the real estate leases included in the Assumed Contracts Schedule 1.1(e); and

(c)    Titles for all of the vehicles listed in Schedules 1.1(l) and 1.1(m) including those designated to be retitled to Seller, which titles shall be free and clear of all liens or encumbrances whatsoever; and

(d)    such other documents and other instruments of transfer and conveyance as may reasonably be requested by Purchaser, each in form and substance satisfactory to Purchaser and its legal counsel and executed by Seller.

7.8    Not Used.

## ARTICLE VIII
## BANKRUPTCY PROCEEDING

8.1    Sale Motion and Order. Purchaser understands that the sale is subject to higher bids at the Bankruptcy Court sale confirmation hearing (the "Bankruptcy Sale") in accordance with the Bidding Procedures (and modifications thereto) approved by the Bankruptcy Court.

## ARTICLE IX
## TERMINATION

9.1    Termination of Agreement. The Parties may terminate this Agreement as provided below:

12

(a)     Purchaser and Seller may terminate this Agreement by mutual written consent at any time prior to Closing;

(b)     Purchaser may terminate this Agreement at its option by giving written notice to Seller at any time prior to the Closing if:

(i)     Seller has breached any representation, warranty, or covenant contained in Articles II and/or IV of this Agreement in any material respect, or Seller fails to consummate the transactions contemplated by this Agreement, notwithstanding the satisfaction or waiver of all of the conditions set forth in Section VI hereof; or

(ii)     Purchaser's conditions to Closing set forth in Article VII are not satisfactorily met in Purchaser's sole discretion; or

(iii)     The Closing shall not have occurred on or before February 19, 2010, unless the Parties agree otherwise (unless the failure results primarily from Purchaser itself breaching any representation, warranty, or covenant contained in this Agreement).

| Deleted: 15 |

(c)     Seller may terminate this Agreement by giving written notice to Purchaser at any time prior to Closing if:

(i) Purchaser has breached any representation, warranty, or covenant contained in Articles III and/or V of this Agreement in any material respect, Seller has notified Purchaser of the breach, and the breach has continued without cure reasonably satisfactory to Seller for a period of ten (10) days after the notice of the breach, or Purchaser fails to consummate the transaction contemplated by this Agreement, notwithstanding the satisfaction or waiver of all of the conditions set forth in section VII hereof; or

(ii) The Closing shall not have occurred on or before February 19, 2010, unless the Parties agree otherwise (unless the failure results primarily from Seller breaching any representation, warranty, or covenant contained in this Agreement).

| Deleted: 15 |

9.2     Deposit.     In the event of termination of this Agreement by Purchaser under Section 9.1 above, the Deposit will be returned to Purchaser by Seller within five (5) business days of the receipt of written notice in the case of Section 9.1(b) or (c), or the date that the mutual agreement  is reached by the parties in the case of Section 9.1(a).

## ARTICLE X
## TAXES

10.1    Tax Refunds.  Any tax refunds (including any interest related thereto) received by Purchaser with respect to the Assets or Seller's business relating to taxes paid for the pre-Closing tax period that Seller has paid shall be for the account of Seller, and Purchaser shall pay over any such amount within five (5) business days of receipt thereof.  Purchaser shall include with its remittance to Seller copies of any correspondence, documents or other materials received or transmitted to Purchaser with respect to any tax refund.

10.2    Cooperation on Tax Matters.  Seller and Purchaser shall cooperate fully with each other and make available or cause to be made available to each other for consultation, inspection and copying (at such other Party's expense) in a timely fashion such personnel, tax data, relevant tax returns or portions thereof and filings, files, books, records, documents, financial, technical and operating data, computer records and other information as may be reasonably required (i) for the preparation by such other Party of any tax returns or (ii) in connection with any tax audit or proceeding including one Party to the extent such tax audit or proceeding relates to or arises from the transactions contemplated by this Agreement or Seller's business activities prior to the Closing Date.

## ARTICLE XI
## POST CLOSING ADJUSTMENTS

11.1    Post Closing Adjustments.  Within ten (10) days after the Closing, Seller and Purchaser shall meet to determine and agree upon the amount of the Current Assets on the Seller's interim balance sheet as of the Closing Date (the "Closing Statement") and the disposition (if any) of any Equipment of Seller (as defined in Article 1.3.1 above) since the September 30 Statement (Schedule 1.3(a)) and the preparation of Schedules 2.1(m), 1.1(l), and 1.1(m). Based on the difference of the Currents Assets as of the September 30 Statement (Schedule 1.3(a)) and Schedules 2.1(m), 1.1(l), and 1.1(m) and the Closing Statement and any disposition of the Equipment, the parties will determine the amount of the Closing Adjustments (if any) as set forth in Section 1.3 and Section 1.3.1. In the event that Seller and Purchaser cannot agree on the amount of the Current Assets at Closing, the disposition of the Equipment or the amount of any Closing Adjustments, then the Bankruptcy Court shall have exclusive jurisdiction to adjudicate such dispute(s).

## ARTICLE XII
## MISCELLANEOUS

12.1    Entire Agreement.   This Agreement, the Schedules and Exhibits hereto constitute the entire understanding and agreement of the Parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties with respect to the subject matter hereof.  The express terms hereof control and supersede any course of performance or usage of trade inconsistent with any of the terms hereof.

12.2    Assignment; Binding Upon Successors and Assigns.  Neither Party hereto may assign any of its rights or obligations hereunder without the prior written consent of the other Party hereto; provided,

however, that Purchaser may, without such prior written consent, assign its rights and obligations hereunder to any entity which it controls, is controlled by or with whom it is under common ownership, which entity shall then be deemed the Purchaser hereunder. This Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

12.3   No Third Party Beneficiaries.  No provisions of this Agreement are intended, nor will be interpreted, to provide or create any third party beneficiary rights or any other rights of any kind in any client, customer, affiliate, stockholder, partner, employee of any Party hereto or any other person or entity unless specifically provided otherwise herein, and, except as so provided, all provisions hereof will be personal solely between the Parties to this Agreement.

12.4   Severability.  If any provision of this Agreement, or the application thereof, is for any reason held to any extent to be invalid or unenforceable, the remainder of this Agreement and application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the Parties hereto. The Parties further agree to replace such unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of the void or unenforceable provision.

12.5   Section Headings.  A reference to an Article, Section, Schedule or Exhibit will mean an Article or Section in, or a Schedule or Exhibit to, this Agreement, unless otherwise explicitly set forth. The titles and headings in this Agreement are for reference purposes only and will not in any manner limit the construction of this Agreement.  For the purposes of such construction, this Agreement will be considered as a whole.

12.6   Amendment, Extension and Waivers.  At any time prior to the Closing Date, Purchaser and Seller may, to the extent legally allowed:  (a) extend the time for performance of any of the obligations of the other Party; (b) waive any inaccuracies in the representations and warranties made to such Party contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements, covenants or conditions for the benefit of such Party contained herein.  Any term or provision of this Agreement may be amended at any time.  Any agreement to any amendment, extension or waiver will be valid only if set forth in writing and signed by all Parties.  The waiver by a Party of any breach hereof or default in the performance hereof will not be deemed to constitute a waiver of any other default or any succeeding breach or default.  The failure of any party to enforce any of the provisions hereof will not be construed to be a waiver of the right of such party thereafter to enforce such provisions.

12.7   Confidentiality.  Purchaser acknowledges that it has and will receive certain confidential information with respect to the operations of Seller.  Purchaser, along with its agents and representatives, shall act in accordance with the Confidentiality Agreement signed between Sargent Electric Company and MelCap Partners LLC.

12.8   Governing Law.  The validity of the Agreement, the construction of its terms, and the interpretation and enforcement of the rights and duties of the Parties to this Agreement will be exclusively governed by and construed in accordance with the internal laws of the Commonwealth of Pennsylvania without reference to that body of law relating to conflicts of law or choice of law.

12.9    Jurisdiction; Venue; Waiver of Jury Trial.

(a)     Each Party to this Agreement hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes between the Parties pertaining directly or indirectly to this Agreement or to any matter arising herefrom. To the extent permitted by law, each Party hereby expressly submits and consents in advance to such jurisdiction in any action or proceeding commenced by the other Party, and agrees that service of such summons and complaint or other process or papers may be made by registered or certified mail addressed to such Party at the address to which notices are to be sent pursuant to this Agreement. Each of the Parties waives any claim that the Bankruptcy Court is an inconvenient forum or an improper forum based on lack of venue. The choice of forum set forth in this Section shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action to enforce the same in any other appropriate jurisdiction.

(b)     Each Party hereto waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury with respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement. Each Party hereto (i) certifies that no representative, agent or attorney of the other Party has represented, expressly or otherwise, that the other Party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other Party hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section.

12.10   Notices. Any notice or other communication required or permitted to be given under this Agreement will be in writing or electronic written format, will be delivered personally or by mail or express delivery, postage prepaid, or by electronic mail or by facsimile transmission, and will be deemed given upon actual delivery, or upon transmission if sent via electronic mail or facsimile transmission, or, if mailed by registered or certified mail, on the third business day following deposit in the mail, addressed as follows:

If to Purchaser, to:


Gary Groom
Sargent Electric Company
2767 Liberty Avenue
Pittsburgh, PA  15237
Fax:  (412) 394-7535
Email:  ggroom@sargent.com


with a copy to:


David W. Lampl, Esq.
Leech Tishman Fuscaldo & Lampl, LLC
30th Floor, 525 William Penn Place
Pittsburgh, PA  15219
Fax:  (412) 227-5551

16

Email: dlampl@leechtishman.com

If to Seller, to:

Joseph A. Thayer
President & CEO
Thayer Power and Communication Line Construction Co., Inc.
7400 Market Road
P.O. Box 915
Fairview, Pennsylvania 16415
Fax: (814) 835-3884
Email: josephthayer@thayerpc.com

with a copy to:

Lawrence C. Bolla, Esq.
Quinn Law Firm
2222 West Grandview Boulevard
Erie, Pennsylvania 16506
Fax: (814) 835-2076
Email: lbolla@quinnfirm.com

12.11 Time is of the Essence. The Parties hereto acknowledge and agree that time is of the essence in connection with the execution, delivery and performance of this Agreement.

12.12 Due Diligence Inspection. Seller shall permit Purchaser and its agents, legal counsel, accountants, and other representatives to: (a) have reasonable access during normal business hours to all properties, inventory and equipment of Seller; (b) inspect and make copies of any and all documents and records of Seller including without limitation all journals, ledgers, stock records, personnel records, contracts, leases, licenses and all other records, regardless of kind or character, as Purchaser shall from time to time reasonably request; (c) review the books and records of Seller; and (d) conduct such other due diligence as Purchaser or its counsel may reasonably deem advisable. Purchaser acknowledges that any such inspection is subject to the Confidentiality Agreement signed between Sargent Electric Company and MelCap Partners LLC.

12.13 Counterparts. This Agreement may be executed in counterparts, each of which will be an original as regards any Party whose name appears thereon and all of which together will constitute one and the same instrument, and may be delivered electronically. This Agreement will become binding when one or more counterparts hereof, individually or taken together, bear the signatures of all Parties reflected hereon as signatories.

[Signature Page Follows]

17

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement as of the date first set forth above.

**SELLER**
THAYER POWER & COMMUNICATION LINE
CONSTRUCTION CO., INC.

By:_____
    Name:
    Title:

**PURCHASER**
SARGENT ELECTRIC COMPANY

By:_____
    Name: Stephan H. Dake
    Title:  President

## Schedule 1.1(e)
## Assumed Contracts

| Assumed Contract | Cure Amount |
|---|---|
| AT&T Contract Agreement No. 2676AM, 2676N dated January 7, 2010 | $0.00 |
| Verizon Contract No. C0506353 and Contract Amendment AGR003033-2009 dated effective November 15, 2009 | $0.00 |
| American Electric Power Contract No. Unkown with Supplementary Terms and Conditions dated February 29, 2008 | $0.00 |
| Aldelphia Cable Communications Contractor Agreement, Contract Number and Date Unkown | $0.00 |
| All executory contracts and work orders between Seller and customers with work remaining to be completed by Seller (other than just warranty or punchlist work) or with payments remaining to be made by customer. | $0.00 |
| The Jamie Joe Group – lease of 7400 Market Road, Fairview, Pa 16415 and lease of 973 New Castle Road, Butler, PA 16001 | $0.00 |
| Gross Lease Agreement, dated October 2, 2006, as amended by First Amendment to Lease Agreement, dated September 23, 2009, between YDT Sinclair Road LLC and Seller, for 3,200 square feet of floor area at 5158 Sinclair Road, Columbus, OH | $0.00 |
| Lease (no title), dated November 2, 2005, between Michael Downing Realty and Seller, regarding 4328 Cranwood Parkway, Warrensville Heights, OH 44128 | $0.00 |

**Deleted:** 10,731.82

| | |
|---|---|
| Lease, dated June 28, 2007, between ProCleve Instruments, LLC and Seller regarding 800 Killian Road, Akron, OH 44319 | $0.00 |
| Lease Agreement, date April 1, 2009 between Weber Holdings-Westpick LLC and Seller regarding 117 Cypress Street, Reynoldsburg, OH 43068 | $0.00 |

**Schedule 1.3(a)**
**September 30, 2009 Balance Sheet and Addendum – Aged Trial Balance as of September 30, 2009**

**See Attached**

Thayer Power and Communication Line Construction Co., Inc.
Balance Sheet
September 30, 2009

| | Book value at end of current reporting month | Book value on petition date |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Unrestricted cash and equivalents | | |
| Cash on hand | $ 119,391.17 | $ (48,362.50) |
| Payroll tax escrow | 27,410.15 | 2,537.82 |
| Accounts receivable, net * | - | - |
| Expense advance to insider | 2,372,382.20 | 3,804,766.26 |
| Inventories, net of reserves | 1,346.03 | - |
| Costs in excess of billings on uncompleted contracts | 100,000.00 | 609,929.64 |
| Costs and estimated earnings in excess of billings | 762,126.54 | 736,995.00 |
| Deposits to vendors | 120,682.63 | 120,682.63 |
| Prepaid expenses | 86,984.54 | - |
| Professional retainers | 126,290.17 | - |
| Unsecured creditor fund | 40,000.00 | 25,000.00 |
| TOTAL CURRENT ASSETS | 100,000.00 | - |
| | 3,856,613.43 | 5,251,548.85 |
| **PROPERTY AND EQUIPMENT** | | |
| Machinery and equipment | 8,913,668.59 | 8,895,707.01 |
| Leasehold improvements | 243,455.06 | 243,455.06 |
| Less accumulated depreciation | 8,650,310.92 | 7,991,812.93 |
| TOTAL PROPERTY AND EQUIPMENT | 506,812.73 | 1,147,349.14 |
| **TOTAL ASSETS** | $ 4,363,426.16 | $ 6,398,897.99 |

\* - See Addendum to Schedule 1.3(a) – Aged Trial Balance as of Sept. 30, 2009.

**Thayer Power and Communication Line Construction Co., Inc.**
**Balance Sheet**
**September 30, 2009**

| | Book value at end of current reporting month | Book value on petition date |
|---|---|---|
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **LIABILITIES NOT SUBJECT TO COMPROMISE (Postpetition)** | | |
| Accounts payable - trade | $ 301,062.66 | $ - |
| Bank credit card payable | 3,487.09 | |
| Taxes payable (refer to Form MOR-4) | - | - |
| Accrued payroll (includes 8,986.46 due to insiders) | 138,021.89 | - |
| Accrued insurance | - | - |
| Accrued union benefits | - | - |
| Accrued rent | 62,864.06 | - |
| Accrued interest and bank fees | - | |
| **TOTAL POSTPETITION LIABILITIES** | 80,000.00 | - |
| | 585,435.70 | - |
| | | |
| **LIABILITIES SUBJECT TO COMPROMISE (PREPETITION)** | | |
| Bank overdraft (Key Bank) | 267,424.94 | 420,462.81 |
| Accounts payable - trade | 1,513,331.67 | 1,569,766.20 |
| Bank credit card payable | 198,244.40 | 198,244.40 |
| Billings in excess of costs and estimated earnings | 86,945.06 | 86,945.06 |
| Accrued rent (due to insiders) | 5,000.00 | 5,000.00 |
| Taxes payable | 4,149,198.58 | 4,436,572.71 |
| Accrued interest | 34,518.37 | 117,886.43 |
| Accrued insurance | 295,599.00 | 430,974.58 |
| Accrued payroll | - | 148,082.67 |
| Withheld support | 4,249.83 | 6,745.08 |
| Accrued union benefits | 756,768.72 | 1,069,889.46 |
| Accrued pension | (2,955.58) | 18,943.86 |
| Interest rate swap liability | 162,076.30 | 162,076.30 |
| Loan payable - Jamie/Joe Group (insiders) | 138,795.09 | 138,795.09 |
| Capital lease obligations | 696,627.26 | 935,560.23 |
| Line of credit | 2,366,937.63 | 2,500,000.00 |
| Long-term debt | 6,000,000.00 | 6,000,000.00 |
| **TOTAL LIABILITIES SUBJECT TO COMPROMISE (PREPETITION)** | 16,673,761.77 | 18,245,944.88 |
| | | |
| **STOCKHOLDERS' ACCUMULATED DEFICIT** | | |
| Capital stock | 450.00 | 450.00 |
| Additional paid-in capital | 6,761.00 | 6,761.00 |
| Retained earnings - prepetition | (11,904,978.48) | (11,854,257.89) |
| Retained earnings - postpetition | (998,003.33) | - |
| **TOTAL STOCKHOLDERS' ACCUMULATED DEFICIT** | (12,895,770.81) | (11,847,046.89) |
| | | |
| **TOTAL LIABILITIES AND STOCKHOLDER'S DEFICIT** | $ 4,363,426.16 | $ 6,398,897.99 |

**Addendum to Schedule 1.3(a) - Thayer Power and Communication Line Construction Co., Inc. - Aged Trial Balance as of September 30, 2009.**
**The entire Aged Trial Balance has been redacted for confidentiality reasons.**
**The entire Aged Trial Balance is incorporated to this Addendum as if fully set forth herein.**

A/R Aged Trial Balance by Document Date (ARTBAL01)

| | |
|---|---|
| Account Type | [All Customers] |
| Age Transactions As Of | [9/30/2009] |
| Cutoff by Year/Period | [2009-09] |
| Print Transactions In | [Detail by Document Date] |
| Contact/Phone/Credit | [No] |
| Space For Comments | [No] |
| Include Only Customers Over Their Credit Limits | [No] |
| Print Zero-Balance Customers | [No] |
| Include Paid Transactions | [No] |
| Include Applied Details | [No] |

| Customer No. | Customer Name/ Ty. | Document No. | Doc. Date | Due Date or Check/Recpt. No. | Current | 1 To 30 Days | 31 To 60 Days | 61 To 90 Days | Over 90 Days | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| ▓▓ | ▓▓▓▓ | | | | | | | | 80.00 | 80.00 |
| | | | | | | | | | 1,156.50 | 1,156.50 |
| | **Customer Total :** | | | | 0.00 | 0.00 | 0.00 | 0.00 | 1,236.50 | 1,236.50 |
| ▓▓ | ▓▓▓▓ | | | 1/15/2007 | -0.01 | | | | | -0.01 |
| | **Customer Total :** | | | | -0.01 | 0.00 | 0.00 | 0.00 | 0.00 | -0.01 |
| ▓▓ | ▓▓▓▓ | | | | | | | | 3,313.50 | 3,313.50 |
| | | | | | | | | | 2,220.00 | 2,220.00 |
| | | | | | | | | | 148.00 | 148.00 |
| | | | | | | | | | 3,075.00 | 3,075.00 |
| | | | | | | | | | 4,020.50 | 4,020.50 |
| | | | | | | | | | 4,337.50 | 4,337.50 |
| | | | | | | | | | 4,828.50 | 4,828.50 |
| | | | | | | | | | 5,650.50 | 5,650.50 |
| | | | | | | | | | 70.31 | 70.31 |
| | **Customer Total :** | | | | 0.00 | 0.00 | 0.00 | 0.00 | 27,663.81 | 27,663.81 |
| ▓▓ | ▓▓▓▓ | | | | | | | | 670.55 | 670.55 |
| | | | | | -25.71 | | | | -25.71 | -25.71 |
| | | | | | | | | | 1,924.00 | 1,924.00 |

| | | | | |
|---|---|---|---|---|---|
| | 2,082.53 | | | | 2,082.53 |
| | 64.20 | | | | 64.20 |
| | 1,881.00 | | | | 1,881.00 |
| | 780.00 | | | | 780.00 |
| | 3,904.20 | | | | 3,904.20 |
| | 3,500.59 | | | | 3,500.59 |
| | 9.20 | | | | 9.20 |
| | 412.41 | | | | 412.41 |
| | 435.95 | | | | 435.95 |
| | 1,508.50 | | | | 1,508.50 |
| | 389.52 | | | | 389.52 |
| | 592.74 | | | | 592.74 |
| | 389.52 | | | | 389.52 |
| | 368.66 | | | | 368.66 |
| | 389.52 | | | | 389.52 |
| | 216.68 | | | | 216.68 |
| | 211.81 | | | | 211.81 |
| | 766.60 | | | | 766.60 |

**Customer Total :** 13,875.90 | 344,899.21 | 65,225.89 | 37,200.60 | 256,043.25 | 717,244.85

| | | | | | |
|---|---|---|---|---|---|
| | | | | 1,500.00 | 1,500.00 |

**Customer Total :** 0.00 | 0.00 | 0.00 | 0.00 | 1,500.00 | 1,500.00

| | | | | | |
|---|---|---|---|---|---|
| | 83.40 | | | | 83.40 |
| | 60.30 | | | | 60.30 |
| | 424.00 | | | | 424.00 |
| | 180.00 | | | | 180.00 |
| | 140.00 | | | | 140.00 |
| | 1,900.00 | | | | 1,900.00 |

**Customer Total :** 0.00 | 0.00 | 0.00 | 0.00 | 2,827.70 | 2,827.70

**Report Total:** 229,965.98 | 1,254,397.85 | 410,854.85 | 116,178.02 | 704,770.29 | 2,718,185.99

8.46 %    46.15 %    15.12 %    4.35

CR: Credit Note    DB: Debit Note    IN: Invoice    IT: Interest Charge    PT: Prepayment    UC: Unapplied Cash

AD: Adjustment    CF: Applied Credit (from)    CT: Applied Credit (to)    DF: Applied Debit (from)    DT: Applied Debit (to)    ED: Earned Discount Taken

GL: Gain or Loss (multicurrency ledgers)    PY: Receipt    WO: Write-Off

56 customers printed

## Schedule 1.1(l)
## Debtor Owned Vehicle List

| Motor Vehicle | Date of Title | Lienholder |
|---|---|---|
| 2000 Ford Truck (VIN 1FTNX20F8YEC86874) | 5/1/2000 | Key Bank N.A. |
| 2000 Butler Trailer (VIN 1BUP25105Y1002222) | 6/22/2000 | Key Bank N.A. |
| 2000 Ford Truck (VIN 1FDAW56F3YEC86870) | 7/3/2000 | Key Bank N.A. |
| 1999 Ford Truck (VIN 1FDXF46F4XEE75451) | 10/26/1999 | Key Bank N.A. |
| 1999 Ford Truck (VIN 1FDXF46F8XEE75453) | 10/26/1999 | Key Bank N.A. |
| 2002 Butler Trailer (VIN 1BUP2510921005258) | 4/23/2002 | Key Bank N.A. |
| 2000 Ford Truck (VIN 1FDXF46F5YED73335) | 3/25/2002 | Key Bank N.A. |
| 2000 Ford Truck (VIN 1FDXF46F7YED73336) | 3/25/2002 | Key Bank N.A. |
| 2001 Cornelius Trailer (VIN 4MJUB20241E029609) | 8/10/2001 | Key Bank N.A. |
| 2001 Rogers Trailer (VIN 1RBH372001AR23634) | 7/16/2001 | Key Bank N.A. |
| 2001 GMC Truck (VIN 1GTHG39R711223505) | 6/27/2001 | Key Bank N.A. |
| 2001 GMC Truck (VIN 1GTHG39R411226541) | 6/27/2001 | Key Bank N.A. |
| 2001 Ford Truck (VIN 1FTNX20F91EC19898) | 6/4/2001 | Key Bank N.A. |
| 2001 Chevrolet Truck (VIN 1GCHG39RX11138271) | 5/31/2001 | Key Bank N.A. |
| 2001 International Truck (VIN 1HTSDAAN61H340708) | 4/17/2001 | Key Bank N.A. |
| 2001 International Truck (VIN 1HTSDAAN41H340707) | 4/17/2001 | Key Bank N.A. |
| 2000 Jeep Cherokee (VIN 1J4FF58S7YL198088) | 4/3/2001 | Key Bank N.A. |
| 2000 GMC Truck (VIN 1GDM7H1C7YJ509637) | 7/11/2000 | Key Bank N.A. |
| 2000 Butler Trailer (VIN 1BUP25107Y1002223) | 6/23/2000 | Key Bank N.A. |
| 2000 Butler Trailer (VIN 1BUC1010571002225) | 6/23/2000 | Key Bank N.A. |
| 2000 Butler Trailer (VIN 1BUC1010103Y1002224) | 6/22/2000 | Key Bank N.A. |
| 2000 International Truck (VIN 1HTSDAAN9YH2566750) | 6/12/2000 | Key Bank N.A. |
| 2000 Belshe Trailer (VIN 16JF02032Y1034422) | 6/6/2000 | Key Bank N.A. |
| 2000 Ford Truck (VIN 1FTSS34F2YHB27431) | 5/5/2000 | Key Bank N.A. |
| 2000 Ford Truck (VIN 1FTNX20F4YEC86872) | 5/3/2000 | Key Bank N.A. |
| 2000 Ford Truck (VIN 1FTNX20F6YEC86873) | 5/3/2000 | Key Bank N.A. |
| 2000 Ford Truck (VIN 1FTNX20F2YEC86871) | 5/3/2000 | Key Bank N.A. |
| 2000 GMC Truck (VIN 1GDM7H1C1YJ509410) | 4/17/2000 | Key Bank N.A. |
| 1998 Brooks Brothers Trailer (VIN 1B9PS0819WM274104) | 10/14/1999 | Key Bank N.A. |
| 1998 Belshe Trailer (VIN 16JF01426W1032150) | 6/2/1999 | Key Bank N.A. |
| 1999 International Truck (VIN 1HTSDAAN1XH654064) | 3/12/1999 | Key Bank N.A. |
| 1999 International Truck (VIN 1HTSDAANXXH654063) | 3/12/1999 | Key Bank N.A. |
| 1997 Peterbilt Tractor Trailer (VIN 1XPGDU9X6VN430747) | 10/16/1996 | Key Bank N.A. |
| 1995 EMI Trailer (VIN 1EMRN50R5T031843A) | 4/30/1996 | Key Bank N.A. |
| 2005 Butler Trailer (VIN 1BUC1010051002192) | 7/12/2005 | Key Bank N.A. |
| 2001 Jeep SW (VIN 1J4FF48S51L584296) | 9/17/2001 | Key Bank N.A. |
| 2002 Chevrolet Truck (VIN 1GCHG39R921104291) | 9/20/2001 | Key Bank N.A. |
| 2001 Ford Truck (VIN 1FTNX20F71ED87569) | 8/3/2001 | Key Bank N.A. |
| 2002 Butler Trailer (VIN 1BUC2520X21005444) | 11/7/2002 | Key Bank N.A. |
| 2003 International Truck (VIN 1HTMKAAN73H558156) | 11/22/2002 | Key Bank N.A. |
| 2000 I-Telsta (VIN 1HTSDAANOYH256751) | 5/25/2000 | Key Bank, N.A. |
| 2005 Chevrolet Truck (VIN 1GCHK29UX5E268191) | 5/6/2005 | Key Bank N.A. |
| 2005 Butler Trailer (VIN 1BUC1010151001987) | 4/23/2005 | Key Bank N.A. |

| | | |
|---|---|---|
| 2005 Butler Trailer (VIN 1BUC1010551001989) | 4/23/2005 | Key Bank N.A. |
| 2005 Butler Trailer (VIN 1BUC1010351001988) | 4/23/2005 | Key Bank N.A. |
| 2005 Chevrolet Truck (VIN 1GCHK39235E233626) | 3/16/2005 | Key Bank N.A. |
| 2005 Chevrolet Truck (VIN 1GCHK39245E234400) | 3/10/2005 | Key Bank N.A. |
| 2005 Chevrolet Truck (VIN 1GCHK39275E235394) | 3/10/2005 | Key Bank N.A. |
| 2000 Ford Truck (VIN 3FDNF6527YMA44924) | 3/9/2005 | Key Bank N.A. |
| 2005 Chevrolet Truck (VIN 1GCHG39U951161406) | 2/24/2005 | Key Bank N.A. |
| 2004 Chevrolet Truck (VIN 1GCHK332X4F226321) | 5/28/2004 | Key Bank N.A. |
| 2004 Chevrolet Truck (VIN 1GCHK39244E330154) | 5/28/2004 | Key Bank N.A. |
| 2004 International Truck (VIN 1HTMKAAN74H611214) | 10/9/2003 | Key Bank N.A. |
| 2003 Chevrolet Truck (VIN 1GBJK39163E211775) | 9/2/2003 | Key Bank N.A. |
| 2003 Chevrolet Truck (VIN 1GBJK39103E218785) | 7/8/2003 | Key Bank N.A. |
| 2003 Chevrolet Truck (VIN 1GCHC29193E126432) | 11/7/2002 | Key Bank N.A. |
| 2003 Chevrolet Truck (VIN 1GCHC29193E131033) | 11/7/2002 | Key Bank N.A. |
| 2003 International Truck (VIN 1HTMKAAN53H558155) | 5/23/2002 | Key Bank N.A. |
| 1999 Ford Truck (VIN 1FTSE34L5XHA77281) | 4/24/2002 | Key Bank N.A. |
| 2000 Freightliner Truck (VIN 1FV6HJAA7YHA41407) | 11/9/2004 | Key Bank N.A. |
| 2000 Freightliner Truck (VIN HTMKAAN45H106197) | 10/14/2004 | Key Bank N.A. |
| 2004 Butler Trailer (VIN 1BUP2510241001491) | 8/26/2004 | Key Bank N.A. |
| 2000 Chevrolet Truck (VIN 1GBJC34R7YF493551) | 7/30/2004 | Key Bank N.A. |
| 2004 Chevrolet Truck (VIN 1GBJK39204E326950) | 7/28/2004 | Key Bank N.A. |
| 2001 Cable Trailer (VIN 1BUC1010211004553) | 6/14/2001 | Key Bank, N.A. |
| 2001 Cable Trailer (VIN 1BUC10105Y1002032) | 6/14/2001 | Key Bank, N.A. |
| 2001 Cable Trailer (VIN 1BUC1010411004554) | 6/14/2001 | Key Bank, N.A. |
| 2003 C-3500 Pickup (1GBJK39163E211775) | 9/2/2003 | Key Bank, N.A. |
| | | |
| **Vehicles Owned Free & Clear** | **Date of Title** | |
| 1990 Butler Trailer (VIN 1BUP25101L1007966) | 8/8/2001 | |
| 1997 Ford Truck (VIN 1FTHX25F3VEC67909) | 12/5/1997 | |
| 1996 Ford Truck (VIN 1FDLF47F0TEA99760) | 9/12/1996 | |
| 1995 Ford Truck (VIN 1FDLF47FXSEA49432) | 10/29/1996 | |
| 2002 Skylift Mini Derrick (VIN 1021) | 10/31/2002 | |
| 1997 Ford Truck (VIN 1FTDX1723VKA09698) | 2/28/1996 | |
| 1992 Butler Trailer (VIN 1BUC1010XM1009276) | 8/8/2001 | |
| 2001 Ford Truck (VIN 1FDXF46F21EA67702) | 6/14/2001 | |
| 2001 Top Brand Trailer (1TBUT0718WV014947) | 4/16/2001 | |
| 1990 Butler Trailer (VIN 1BUP25109L1007965) | 10/25/2000 | |
| 1991 Butler Trailer (VIN 1BUC10106M1009159) | 3/12/1990 | |
| 1997 Ford Truck (VIN 1FDXF80E3VVA00197) | 8/30/2000 | |
| 2000 Rogers Trailer (VIN 1RBT3120XYAR23755) | 7/27/2000 | |
| 2000 Ford Truck (VIN 3FDNF655XYMA42594) | 6/7/2000 | |
| 1997 Ford Truck (VIN 1FTHX25F8VEC67923) | 12/5/1997 | |
| 1997 Ford Truck (VIN 3FELF47F2VMA60810) | 7/2/1998 | |
| 1991 Butler Trailer (VIN 1BUC10103M1008275) | 9/8/1998 | |
| 1998 International (VIN 1HTSDAAN7WH501610) | 8/29/1997 | |
| 2007 Butler Trailer (VIN 1BUC101871003559) | 5/29/2007 | |
| 2007 Butler Trailer (VIN 1BUP2510171003589) | 7/12/2007 | |
| 2007 Butler Trailer (VIN 1BUP2510561003254) | 1/9/2008 | |

23

| | | |
|---|---|---|
| 2007 (Pole) Semi Trailer (VIN 1BUP2510371003951) | 3/6/2008 | |
| 2007 Butler Trailer (VIN 1BUP2510871003914) | 3/6/2008 | |
| 1980 Highway Trailer (VIN 137553) | Unknown | |
| 1990 International Truck (VIN 1HTSETVN6LH228061) | 11/13/1989 | |
| 1988 Butler Trailer (VIN 1BUC1010711003074) | 4/30/1992 | |
| 1993 Hudson Trailer (VIN 10HHTD1A8P1000024) | 8/30/1993 | |
| 1993 Butler Trailer (VIN 1BUP25105P1001733) | 9/23/1993 | |
| 1993 Butler Trailer (VIN 1BUP25103P1001732) | 9/23/1993 | |
| 1995 Ford Truck (VIN 1FDXF80E0SVA35467) | 7/5/1995 | |
| 1995 Ford Truck (VIN 1FDXF80E9SVA35466) | 7/6/1995 | |
| 2007 Load Trail Trailer (VIN 4ZEXF142X71037778) | 5/25/2007 | |
| 2007 Butler Trailer (VIN 1BUC1010771003505) | 5/24/2007 | |
| 2007 Butler Trailer (VIN 1BUC1010571003504) | 5/24/2007 | |
| 2006 Butler Trailer (VIN 1BUP2510861003295) | 4/30/2007 | |
| 2006 Butler Trailer (VIN 1BUC1010461003296) | 4/30/2007 | |
| 2006 Butler Trailer (VIN 1BUP2510861003006) | 7/17/2006 | |
| 2006 Butler Trailer (VIN 1BUP2510X61003007) | 7/17/2006 | |
| 2006 Fobes Trailer (VIN TA62016PF67KTE260) | 5/23/2006 | |
| 2006 Carry On Trailer (VIN 4YMUL06166V018505) | 5/19/2006 | |
| 2006 Butler Trailer (VIN 1BUP2510961002981) | 5/12/2006 | |
| 2006 Fobes Trailer (VIN TA62016PF57KTE249) | 1/31/2006 | |
| 2004 Cable Reel (VIN 1BUC1010341001097) | 5/11/2004 | |
| 2001 Conrail Trailer (VIN 4KNUC16201L161267) | 6/12/2003 | |
| 2003 Atlas Trailer (VIN 5HCKC16233E001516) | 10/22/2002 | |
| 2002 Corn Trailer (VIN 4MJUB2027E031470) | 5/6/2002 | |
| 2006 Millennium Trailer (VIN 5MTPD25266A000046) | 12/2/2005 | |
| 1994 Butler Trailer (VIN 1BUC10108R1003435) | 2/15/2005 | |
| 2004 Cam Trailer (VIN 5JPBU20284P007968) | 10/19/2004 | |
| 2005 Elk River Trailer (VIN 1E9B120205E353366) | 9/28/2005 | |
| 2004 I-Truck Tractor (VIN 2HSCNASE44C085950) | 5/13/2003 | The owner on this vehicle is incorrectly listed as Five Star International, Inc. on the Certificate of Title. To be retitled to Seller. |
| 2003 Pole Trailer (VIN 4HAAB20033B000006) | 3/29/2005 | |
| 1988 Pole Trailer (VIN 1BUP2510811002401) | Unknown | |
| 1980 Pole Trailer (VIN TJ3781PA) | Unknown | Owner: David O. Thayer. To be retitled to Seller prior to Closing. |
| 2000 Cable Trailer (VIN 1BUC10103Y1002224) | 6/22/2000 | |
| 1994 Cable Trailer (VIN 1BUC10102R1003589) | 2/19/1998 | |
| 1992 Cable Trailer (VIN 1BUC10103N1009704) | 2/19/1998 | |
| 1991 Cable Trailer (VIN 1BUC10104M1009158) | 10/25/2000 | |
| 2000 Cable Trailer (VIN 145515) | Unknown | |
| 2004 Equipment Trailer (VIN 5FTDE272731020059) | 8/28/2004 | |

| | | |
|---|---|---|
| 2004 Equipment Trailer (VIN 10HHBC10441000036) | 7/12/2004 | |
| 2002 Equipment Trailer (VIN 1S9KF202X1L801012) | 11/19/2002 | |
| 1993 Equipment Trailer (VIN 1BUD12109P1001691) | 3/22/2004 | |
| 1998 Cable Trailer (883074) | 4/30/1992 | |

## Schedule 1.1(m)
## James Thayer Owned Vehicle List

| Motor Vehicle | Date of Title | Lienholder* |
|---|---|---|
| 2007 Chevrolet Truck (1GCHK39D07E111441) | 10/20/2006 | GMAC |
| 2007 Chevrolet Truck (1GCHK39D97E110708) | 10/20/2006 | GMAC |
| 2007 Chevrolet Truck (1GBHK39D47E121569) | 3/7/2007 | GMAC |
| 2006 Chevrolet Truck (1GCHK39D96E268786) | 7/18/2006 | GMAC (Paid Off) |
| 2006 Chevrolet Truck (1GCHK39296E103853) | 4/12/2006 | GMAC (Paid Off) |
| 2006 Chevrolet Truck (1GCHK39D76E277969) | 7/18/2006 | GMAC (Paid Off) |
| 2007 Chevrolet Truck (1GCHK39D77E137003) | 3/5/2007 | GMAC |
| 2007 Chevrolet Truck (1GCHK23DX7F184068) | 3/7/2007 | GMAC |
| 2007 Chevrolet Truck (1GCHK29U57E186677) | 3/7/2007 | GMAC |
| 2007 Chevrolet Truck (1GCHK39D47E136486) | 3/5/2007 | GMAC |
| 2006 Chevrolet Truck (1GCHK23D66F168173) | 7/18/2006 | GMAC |
| 2006 Chevrolet Truck (1GCHK39D06E266683) | 6/22/2006 | GMAC |

* All liens to be removed prior to Closing.

## Schedule 1.4
## Purchased Equipment Leases

| Unit Number | Year | Model | Type |
|---|---|---|---|
| **Key Equipment Financing Schedule #1** | | | |
| 9054 | 2005 | Chevrolet C-2500 | Pickup Truck |
| 9056 | 2005 | Chevrolet C-2500 | Pickup Truck |
| 3965 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 2890 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 9607 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 9081 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 8097 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 4598 | 2004 | International 7600 | Fassi F330B.24 Crane |
| **Key Equipment Financing Schedule #2** | | | |
| 1705 | 2005 | New Holland | Backhoe |
| **Key Equipment Financing Schedule #3** | | | |
| 0537T | 2006 | Chevrolet C-2500 | Pickup Truck |
| 9328 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 1746 | 2006 | Chevrolet C-3500 | Pickup Truck |
| 3851 | 2006 | Ford F-450 | Bucket Truck |
| 7039 | 2006 | International 7400 | Pro Max Dump Truck |
| 7040 | 2006 | International 7400 | Pro Max Dump Truck |
| 2493 | 2005 | Butler | Pole Trailer |
| 2724 | 2005 | Butler | Pole Trailer |
| 2723 | 2005 | Butler | Pole Trailer |
| 2722 | 2005 | Butler | Pole Trailer |
| 2491 | 2005 | Butler | Reel Trailer |
| 2490 | 2005 | Butler | Reel Trailer |
| 2492 | 2005 | Butler | Reel Trailer |

27

| | | | | | |
|---|---|---|---|---|---|
| 2719 | 2005 | Butler | Reel Trailer | | |
| 2720 | 2005 | Butler | Reel Trailer | | |
| 2721 | 2005 | Butler | Reel Trailer | | |

**Key Equipment Financing Schedule #4**

| | | | | | |
|---|---|---|---|---|---|
| 5907 | | Chicago Pneumatic | Model 185 Air Compressor | | |
| 2920 | | Atlac Comcp | Model VAS185 Air Compressor | | |
| 1023 | 2005 | Bobcat | Model 430 Mini Excavator | | |

**Key Equipment Financing Schedule #5**

| | | | | | |
|---|---|---|---|---|---|
| 334 | 2006 | Chevrolet C-3500 | Pickup Truck | | |
| 1856 | 2006 | Chevrolet C-3500 | Pickup Truck | | |
| 1411 | 2006 | Chevrolet C-3500 | Pickup Truck | | |
| 8348 | 2006 | Chevrolet C-3500 | Pickup Truck | | |
| 4921 | 2006 | | Equipment Trailer | | |
| | 1995 | | Track Mounted Digger Derrick | | |

**Key Equipment Financing Schedule #6**

| | | | | | |
|---|---|---|---|---|---|
| 7598 | 2006 | Chevrolet C-3500 | Pickup Truck | | |
| 4819 | 2006 | Chevrolet C-3500 | Pickup Truck | | |
| | | | **Buyout Figure** | $400,000 | |

| Equipment |
|---|
| 2005 Directional Drill (Unit #1354) |
| 1978 Derrick/Skidder (Unit #1462) |
| 1994 Air Compressor (Unit #0710) |
| 1983 Air Compressor (Unit #1464) |
| 2004 Rodding Machine (Unit #2559) |
| 1973 Rodding Machine (Unit #7291) |
| 2005 Vermeer Drop Plow (Unit #2437) |
| 2000 Vermeer Drop Plow (Unit #2258) |
| 2003 Vermeer Drop Plow (Unit #2301) |
| 2000 Vermeer Drop Plow (Unit #1983) |
| 1998 Vermeer Drop Plow (Unit #1067) |
| 1995 Vermeer Drop Plow (Unit #3046) |
| 1995 Case Plow (Unit #2455) |
| 1995 Case Plow (Unit #2454) |
| 1995 Case Plow (Unit #5048) |
| 2003 John Deere Backhoe (Unit #4253) |
| 2000 John Deere Backhoe (Unit #2524) |
| 1994 Ford Backhoe (Unit #O433) |
| 2004 Toyota Forklift (Unit #0109) |
| 1995 Clark Forklift (Unit #9488) |
| 1990 Clark Forklift (Unit #7412) |
| 1995 Yale Forklift (Unit #5456) |
| 1980 Ryan Cable Plow (Unit #OOO7) |
| 2002 Honda 4-Wheeler (Unit #9134) |
| 1997 Honda 4-Wheeler (Unit #8485) |
| 2005 Honda 4-Wheeler (Unit #7635) |
| 1998 Cub w/Rototiller (Unit #2014) |
| 2001 Morbark Chipper (Unit #0084) |
| Bore Machine |
| Bore Machine |

| Office Equipment, Furnishings, & Supplies |
|---|
| |
| Inspiron 600M Notebook Computer |
| Dimension 5100 Desktop Computer |
| Inspiron 1525 Notebook Computer |
| Inspiron 6000 Notebook Computer |
| Dimension 8200 Desktop Computer |
| Precision Workstation 210 Desktop Computer |
| Latitude D600 Notebook Computer |
| Poweredge 1600 SC Win 2000 Server |
| Poweredge 2400 Win NT Server |
| Dimension 5150 Desktop Computer |

| |
|---|
| OptiPlex GX110 Desktop Computer |
| Inpiron 9300 Notebook Computer |
| Dimension 1100/B110 Desktop Computer |
| OptiPlex 745 Desktop Computer |
| OptiPlex 745 Desktop Computer |
| OptiPlex 745 Desktop Computer |
| OptiPlex 745 Desktop Computer |
| Dimension 5150/E510 Desktop Computer |
| Dimension 5150/E510 Desktop Computer |
| Dimension 5150/E510 Desktop Computer |
| Power Edge SC440 Server |
| Dimension 4550 Desktop Computer |
| Dimension 5150/E510 Desktop Computer |
| Dimension V4333c Desktop Computer |
| Optiplex GX260 Desktops |
| XPS M1330 Notebook Computer |
| Latitude D810 Notebook Computer |
| Dimension 4300 Desktop Computer |
| Optiplex GX110 Warehouse Scanner |
| V4333c Warehouse UPS |
| Dimension 8300 Desktop Computer |
| Dimension 9100 Desktop Computer |
| Precision Workstation 340 Desktop Computer |
| Latitude D520 Notebook Computer |
| Dimension 5150/E510 Desktop Computer |
| Inspiron 9300  Notebook Computer |
| Dimension 5100 Desktop Computer |
| XPS M1710 Notebook Computer |
| Notebook Computer |
| Notebook Computer |
| Latitude D520 Notebook Computer |
| XPS M1730 Notebook Computer |
| Power Edge 2900 Server |
| Power Edge 1900 Server |
| Power Edge 2400 Backup Server |
| Dimension 9200/XPS 410 Desktop Computer |
| Dimension 8200 Desktop Computer |
| B.Q. Accpac Server |
| Precision Workstation 210 Desktop Computer |
| Inspiron 600M Notebook Computer |
| Dimension 8300 Desktop Computer |
| Latitude D830 Notebook Computer |
| Inspiron 1521 Notebook Computer |
| Latitude D520 Notebook Computer |
| Axim X50 (Electronics) |
| Axim X50 (Electronics) |
| Axim X50 (Electronics) |
| Axim X50 (Electronics) |

| |
|---|
| Axim X51 (Electronics) |
| Customer Kits 2005-2008 (Non-Tied Peripherals) |
| DellWare (Fullfillment) (Non-Tied Peripherals) |
| Spare Parts (Piece Parts) (Non-Tied Peripherals) |
| Service SKU (Non-Tied Peripherals) |
| Customer Kits (Non-Tied Peripherals) |
| 5 Desks |
| 20 Chairs |
| Copier/Fax Stand |
| 8 Desks |
| 15 Chairs |
| Conference Table |
| Copier/Fax Stand |
| 8 Desks |
| 10 Chairs |
| Conference Table |
| 3 Desks |
| 6 Chairs |
| 5 Desks |
| 12 Chairs |
| Drafting Table |
| Copier/Fax Stand |
| 7 Work Stations |
| 15 Desks |
| 35 Chairs |
| Conference Table |
| Drafting Table |
| Misc. Credenzas and tables |

Deleted: Schedule 7.6¶
Sale Order

Exhibit A to Sale Order is the APA and will be attached when Sale Order is submitted to Court

Exhibit B to Sale Order is the Assumed Contracts (Schedule 1.1(e) to the APA) and will be attached when Sale Order is submitted to Court

Exhibit C to Sale Order is the Purchased Equipment (Schedule 1.4 to the APA) and will be attached when Sale Order is submitted to Court

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE: : 

THAYER POWER AND COMMUNICATION :
LINE CONSTRUCTION COMPANY,
    Debtor. :

    _____

THAYER POWER AND COMMUNICATION :
LINE CONSTRUCTION COMPANY,

    Movant, :

       v. :

THE ANDERSON GROUP, LLC; :
KEYBANK, N.A.; UNITED STATES OF
AMERICA, INTERNAL REVENUE
SERVICE; THE COMMONWEALTH OF
PENNSYLVANIA, OFFICE OF THE :
ATTORNEY GENERAL; AND THE
OFFICIAL COMMITTEE OF UNSECURED :
CREDITORS,

    Respondents. :

    _____

: CASE NO. 08-11904(TPA)

: CHAPTER 11

: Docket No. _____

: Related Docket No. 302

: Hearing Date: February 12, 2010 at 2:00
  p.m.

: Response Date: February 11, 2010

: JUDGE AGRESTI

**ORDER GRANTING MOTION FOR ORDER (i) APPROVING SALE OF SUBSTANTIALLY ALL
PERSONAL PROPERTY OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS OUTSIDE THE ORDINARY COURSE OF BUSINESS,
(ii) AUTHORIZING DEBTOR TO ASSUME AND ASSIGN CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (iii) GRANTING RELATED RELIEF**

After a hearing commenced on February 12, 2010 (the "Sale Hearing"): (A) upon

due notice to all persons and parties entitled thereto; (B) upon consideration of the *Motion for*

*Order Approving Sale of Substantially all Personal Property of the Debtor Free and Clear of*

*Liens, Claims, Encumbrances and Interests Outside the Ordinary Course of Business, (ii)*

*Authorizing Debtor to Assume and Assign Certain Executory Contracts and Unexpired Leases,*

*and (iii) Granting Related Relief* (the "Sale Motion"); (C) pursuant to sections 105, 363 and 365

of title 11 of the United States Code (the "Bankruptcy Code"); (D) consistent with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); (E) based upon the proceedings held during the auction on the sale held by this Court on February 12, 2010 (the "Auction"); (F) based upon pleadings and proceedings of record at the Sale Hearing; (G) upon determination of this Court, for good and sufficient cause that the Qualified Bid (as that term is defined in this Court's order approving Bid procedures dated December 29, 2009 (the "Procedures Order") and the modifications made thereto pursuant to the this Court's Order dated January 20, 2010 (the "Modification Order", together with the Procedures Order, the "Bid Procedures Orders") submitted by Sargent Electric Company (the "Purchaser") is the highest and best offer/bid presented to the Court at the Auction; and (H) upon determination of this Court, for good and sufficient cause that consummation of the Asset Purchase Agreement (the "APA"), a copy of which is attached hereto as Exhibit "A"[1], by and between the Purchaser and the Debtor and the sale of the Assets (as that terms is defined in the APA) and the assumption and assignment of the Assumed Contracts (as that term is defined in the APA), is in the best interests of the Debtor, its bankruptcy estate, creditors and other parties in interest, this Court makes the following findings of fact:

A.    Debtor filed the Sale Motion, pursuant to sections 105, 363 and 365of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014, requesting authority to consummate the APA and assume and assign the certain executory contracts and unexpired leases as set forth in the APA. A list of the executory contracts and unexpired Leases to be assumed by the Debtor and assigned to the Purchaser is contained in Schedule 1.1(e) to the APA and attached hereto and marked as Exhibit "B" (the "Assumed Contracts").

---

[1] All capitalized terms used in this Order that are not otherwise defined herein shall have the meaning ascribed to them in the APA.

B.     Further, by the Sale Motion, the Debtor seeks authorization and approval for the purchase by Purchaser of certain of the Debtor's equipment subject to the leases held by Key Bank Equipment Financing in accordance with the terms of APA (the "Purchased Equipment").   A copy of the Purchase Equipment to be purchased and the amount of consideration to be paid by Purchaser is attached to the APA as Schedule 1.4 and is attached hereto as Exhibit "C".

C.     The Debtor filed an Omnibus Motion to Establish Cure Amounts for Executory Contracts and Unexpired Leases (the "Omnibus Motion") setting forth in the related Exhibits (and amendments thereto) to the Omnibus Motion the executory contracts and unexpired leases that the Debtor may seek to assume and assign to a successful bidder, including but not limited to, the Assumed Contracts.

D.     Debtor has complied with all applicable procedures for providing notice of the sale of the Assets and the assignment and assumption of the Assumed Contracts.  Proper, timely and sufficient notice of the Sale Motion, Sale Hearing, Auction and Omnibus Motion was provided and such notice was properly served on all required persons and entities, including, but not limited to, all creditors, all parties with liens against or security interests in any of the Assets, non-Debtor parties to the Assumed Contracts, all local, state and federal taxing authorities, all parties requesting notice in accordance with the Bankruptcy Rules, and all persons claiming any interest in or related to the Assets.

E.     Proper, timely and adequate and sufficient notice of the Sale Motion, the Sale Hearing, the Auction and the Omnibus Motion, has been provided in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014 and Local Bankruptcy Rules 6004-1 and such other applicable sections of the

Bankruptcy Code, Bankruptcy Rules and Local Rules. Such notice was good and sufficient, and appropriate under the particular circumstances and no other or further notice of the Sale Motion, Sale Hearing, Auction and Omnibus Motion is or shall be required In compliance with Local Rule of Bankruptcy Procedure 6004-1 and General Court Procedure #3, the Debtor advertised the Sale Motion, Auction and Sale Hearing in the Erie County Legal Journal on January 15, 2010 and in the Erie Times News on January 17, 2010.

      F.     The notice adequately and accurately discloses the full terms of the proposed sale and the justification for the proposed sale.

      G.     The sale of the Assets pursuant to the terms and conditions set forth in the APA represents the valid and reasonable exercise of the Debtor's business judgment. The Debtor has demonstrated both (i) good, sufficient and sound business purpose and justification pursuant to sections 105 and 363 of the Bankruptcy Code, for the sale of the Assets, and (ii) compelling circumstances for the sale pursuant to 11 U.S.C. § 363(b) prior to, and outside of, a plan of reorganization.

      H.     Assumption and assignment of the Assumed Contracts is proper under 11 U.S.C. § 365 and represents the valid and reasonable exercise of the Debtor's business judgment.

      I.     The terms and conditions of the APA are non-collusive, fair and reasonable. The APA was:

          (i)     Negotiated, proposed and entered into without collusion, in good faith, from arm's length bargaining positions; and
          (ii)    Constitutes the highest and best offer for the Assets.

Neither the Debtor nor Purchaser has engaged in any conduct that would cause or permit the APA to be avoided under 11 U.S.C. § 363(n).

J.     The consideration to be paid by Purchaser for the Assets under the APA: (i) is fair and reasonable; (ii) is the highest and best offer for the Assets provided to the Court at the Auction; (iii) will provide a higher and better recovery for the Debtor's creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

K.     Debtor may sell the Assets free and clear of any and all liens, encumbrances, claims, demands, rights, interests, debts, or commitments, whether absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, known or unknown, including, without limitation any claims predicated upon any theory of successor liability or any similar theory (collectively, the "Liens and Liabilities"), regardless of how or when any such Liens and Liabilities may have arisen or arise because:

(i)     Applicable non-bankruptcy law permits such a sale;

(ii)     Bankruptcy law permits such a sale;

(iii)     Each applicable creditor consents to the sale as proposed in the Sale Motion;

(iv)     If such Liens and Liabilities is a lien, the aggregate value to be received in consideration of the sale of the Assets exceeds the value of any liens upon and security interests in the Assets;

(v)     Applicable creditors could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such Liens and Liabilities; and/or

(vi)     This Court, pursuant to its equitable powers and jurisdiction, has the power and authority to authorize and effectuate the sale of the Assets to Purchaser free and clear of all Liens and Liabilities.

L. Purchaser has available (or will have available on the Closing Date) all necessary cash and other resources required to consummate the APA in accordance with its terms.

M. Debtor and Purchaser have represented that, as of the date of the Sale Hearing, neither is aware of any material breaches of any provisions of the APA.

N. The APA is in the best interest of the Debtor, its creditors and its bankruptcy estate.

O. A reasonable opportunity to bid at the Auction and to object or to be heard regarding the relief requested in the Sale Motion and Omnibus Motion has been offered to all interested parties.

P. The sale is in good faith and the Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and in accordance with In re Abbotts Dairies of Pa., Inc., 788 F.2d 193 (3d Cir. 1986). The Purchaser is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

NOW, THEREFORE, based upon the findings of fact as set forth above and the pleadings and proceedings of record at the Sale Hearing, this Court renders conclusions of law as follows:

A. This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. § 1334. Venue of this bankruptcy case in this Court is proper pursuant to 28 U.S.C. § 1409. The Sale Hearing constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). The statutory predicates for the requested relief are, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code.

B.     No other or further notice of the Sale Motion, the Auction, the Sale Hearing, the Omnibus Motion or the entry of this Order is necessary.

C.     The Notice of the Sale Motion, the Auction, the Sale Hearing and the Omnibus Motion was timely served upon all creditors, non-debtor third parties to the Assumed Contracts and other parties in interest upon whom service is required and the notice satisfies the provisions of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, Local Bankruptcy Rule 6004-1 and any other requirements of due process.

D.     The Notice of the Sale Motion, the Auction, Sale Hearing and the Omnibus Motion served upon creditors, non-debtor third parties to the Assumed Contracts and other parties in interest adequately discloses the business justification for consummation of the APA and all ancillary agreements with the Debtor and the assumption and assignment of the Assumed Contracts, the execution and delivery of which is required by Purchaser as a condition precedent to closing, and the consequences of such consummation for creditors and other parties in interest and for the bankruptcy estate.

E.     Debtor has demonstrated sufficient business reasons for the sale of its Assets pursuant to the APA and the consummation of the APA is in the best interests of its creditors and the bankruptcy estate.

F.     Assumption and assignment of the Assumed Contracts is proper under 11 U.S.C. § 365 and represents the valid and reasonable exercise of the Debtor's business judgment.

G.     Without a sale free and clear of all Liens and Liabilities, the sale of the Assets could not be consummated, or could be consummated only upon terms substantially less favorable to the Debtor's estate.

- 7 -

H. Sufficient cause and justification exist under sections 105(a), 363 and 365 of the Bankruptcy Code to grant the Sale Motion.

I. The sale is in good faith and the Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and in accordance with In re Abbotts Dairies of Pa., Inc., 788 F.2d 193 (3d Cir. 1986). The Purchaser is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

J. In the event the parties to the APA consummate the transactions contemplated hereby while an appeal of this Order is pending, Purchaser shall be entitled to rely upon the protections of section 363(m) of the Bankruptcy Code (without limiting in any way the availability of general "mootness" arguments), absent any stay pending appeal granted by the Closing Date by a court of competent jurisdiction.

K. The Debtor may sell the Assets free and clear of any and all liens, encumbrances, claims, demands, rights, interests, debts, or commitments, whether absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, known or unknown, including, without limitation any claims predicated upon any theory of successor liability or any similar theory (collectively, the "Liens and Liabilities"), regardless of how or when any such Liens and Liabilities may have arisen or arise because:

    (i)    Applicable non-bankruptcy law permits such a sale;

    (ii)   Bankruptcy law permits such a sale;

    (iii)  Each applicable creditor consents to the sale as proposed in the Sale Motion;

    (iv)   If such Liens and Liabilities is a lien, the aggregate value to be received in consideration of the sale of the Assets exceeds the value of any liens upon and security interests in the Assets;

- 8 -

      (v)    Applicable creditors could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such Liens and Liabilities; and/or

      (vi)   This Court, pursuant to its equitable powers and jurisdiction, has the power and authority to authorize and effectuate the sale of the Assets to Purchaser free and clear of all Liens and Liabilities.

L.     As required by section 365(b), the payment of the Cure Amounts on the Assumed Contracts as determined by this Court pursuant to the Omnibus Motion and as set forth in Exhibit "B" to the Omnibus Motion, will cure any defaults under the Assumed Contracts and compensates the non-debtor third party to the Assumed Contracts for any pecuniary loss suffered as a result of the default. The Purchaser has provided adequate assurance of future performance to the non-debtor third parties to the Assumed Contracts as required by section 365(b).

M.    All the transactions contemplated by the APA are properly authorized under sections 105, 363 and 365 of the Bankruptcy Code.

N.    There is no law which prohibits or restricts assignment, conveyance or transfer of any of the Assets to Purchaser.

NOW, THEREFORE, based upon the findings of fact and conclusions of law set forth above and the pleadings and proceedings of record at the Sale Hearing,

IT IS HEREBY ORDERED:

1.    The Sale Motion is granted in its entirety. The APA (including all ancillary agreements to which the Debtor is a party) is approved in all respects and the sale of the Assets is hereby authorized under, *inter alia*, sections 105(a), 363(b) and 365 of the Bankruptcy Code. To the extent any objections to the Sale Motion have not been withdrawn, waived or resolved, such objections are hereby overruled.

2.    The findings of fact and conclusions of law set forth above shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed; and to the extent any conclusion of law shall later be determined to be a finding of fact, it shall be so deemed.

3.    The Debtor is authorized and directed to execute, deliver and perform the APA and all agreements and documents contemplated thereby, including but not limited to: (i) delivery of a customary bill of sale for the Assets; (ii) assignment of the customer contracts and the real estate leases included in the Assumed Contracts Schedule 1.1(e) to the APA; (iii) titles for all of the vehicles listed in Schedules 1.1(l) and 1.1(m) to the APA including those designated to be retitled to Seller, which titles shall be free and clear of all liens or encumbrances whatsoever; and (iv) such other documents and other instruments of transfer and conveyance as may reasonably be requested by Purchaser, each in form and substance satisfactory to Purchaser and its legal counsel and executed by Seller.  The Debtor is further authorized to sell all if its right, title and interest in and to the Assets to Purchaser, free and clear of any and all Liens and Liabilities, in accordance with the terms of the APA.  The APA is, and shall be, binding upon and enforceable against the Debtor and its estate, according to its terms.

4.    Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code and this Court's equitable powers and authority, the Debtor shall convey and deliver to Purchaser good, marketable and transferable title to each of the Assets in which it has an interest at the Closing under the APA, free and clear of all Liens and Liabilities including, without limitation, all security interests, if any, in and all liens upon the Assets.

5.　　Debtor is authorized to execute and deliver such documents, take or perform such acts, and do such other things as may be necessary to effect and carry out the provisions of the APA, all of the transactions related thereto and this Order.

6.　　Neither conversion of this case to a case under Chapter 7 of the Bankruptcy Code nor dismissal of this case shall have any effect upon the rights of Purchaser under or in connection with the APA or this Order, and Purchaser shall be entitled to all of the rights and benefits afforded to it under (i) the APA, (ii) the instruments and documents executed or to be executed in connection with or pursuant to the APA, and (iii) this Order, notwithstanding any such conversion or dismissal.  The APA and the Order shall be binding upon and enforceable against any trustee appointed in this case or in any case to which this case may be converted.  No plan of reorganization or liquidation filed or confirmed in this case shall alter in any way the terms of the APA or this Order, including (without limitation) any of the rights of Purchaser under the APA or this Order.  The provisions of the APA and of this Order shall remain in full force and effect notwithstanding the confirmation of any plan.  In the event of any conflict between the terms of the APA and the terms of any plan of reorganization or liquidation confirmed in this case, the terms of the APA shall govern and control.  Each provision of this Order is a material inducement to Purchaser to consummate the transactions contemplated by the APA and, therefore, the provisions of this Order are and shall be nonseverable.

7.　　The Assumption by the Debtor and assignment to the Purchaser of the Assumed Contracts listed in Exhibit B to this Order and Schedule 1.1(e) to the APA is hereby authorized and approved.  The non-Debtor parties to the Assumed Contracts are bound to the Cure Amounts set forth in Exhibit B.  The non-debtor parties to the Assumed Contracts relating to the real estate leases hereby expressly agree and consent to the assumption and assignment

**Deleted:** <#>Except as expressly permitted or otherwise specifically provided by the APA or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, unions, employees, trade and other creditors, holding interests of any kind or nature whatsoever against or in the Debtor or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtor, the Assets, or the transfer of the Assets to Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting any claim and/or interest, including but not limited to Liens and Liabilities, against Purchaser, its successors or assigns, its property, or the Assets.¶

**Formatted:** Bullets and Numbering

of their respective unexpired lease as evidenced by either their written acknowledgement or acknowledgment made on the record at the Sale Hearing.

8.     This Court retains sole and exclusive jurisdiction to resolve any and all matters or disputes arising under or relating to the APA (including, without limitation all post-closing obligations thereunder), the sale of the Assets, the administration of the sales proceeds by the Debtor, the implementation, interpretation or enforcement of this Order, and the relief and protection afforded to Purchaser by this Order.

9.     Upon entry of this Order, the Purchaser shall be entitled to take reasonable and appropriate measures to secure, protect and inventory the Assets until the Closing Date.

10.    This Order shall be effective and enforceable upon its entry and the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) is hereby waived .

IT IS SO ORDERED, this ____ day of _____, 2010.


_____
_____THOMAS P. AGRESTI
_____CHIEF UNITED STATES BANKRUPTCY JUDGE